CARAWAY, J.
|! This is a medical malpractice action against an emergency room physician who treated the decedent for chest pain. Nine hours after his emergency room treatment began in Jonesboro, the decedent died in a Monroe hospital of a heart attack. The plaintiffs appeal the trial court’s judgments denying new trial and judgment notwithstanding the verdict which were filed after a jury determination that the physician’s treatment did not fall below the standard of care. For the following reasons, we affirm.

Facts

On the afternoon of March 7, 2006, Glen Atkins suffered a sudden onset of chest pain while working at his hair salon near his home in Hodge, Louisiana. Atkins was described by a fellow employee as pale, sweaty and clammy. After 30 minutes, Atkins was taken to the Jackson Parish Emergency Room (“JPER”). Atkins reported his medical history upon arrival at the hospital to emergency room nurses and defendant, Dr. Dirk Rainwater, the emergency room physician. Atkins reported suffering with acid reflux two or three nights a week in previous months *784 which he indicated produced excruciating pain lasting approximately 30 minutes. He had a history of hypertension and obesity. He led a sedentary lifestyle and was a smoker with a family history of heart disease. Atkins reported that he had a negative nuclear stress test[1] for his heart approximately six months | ?prior. He had sustained a fast heartbeat in years past which was corrected with an ablation and heart catheterization.
Significantly, the day before this incident, Atkins had undergone upper and lower gastrointestinal (“GI”) testing. The possibility of a biopsy during such testing was therefore present; however it was not made clear that such biopsy had in fact occurred. Atkins reported that testing to emergency room personnel.
Atkins’ arrival at JPER was at 3:10 p.m. This dispute concerns the medical malpractice of Dr. Rainwater which allegedly resulted from the treatment received at JPER. Atkins left Jonesboro by ambulance at 8:45 p.m. for transfer to St. Francis Medical Center in Monroe. A cardiologist, Dr. Asad Mouhaffel, agreed to receive Atkins as a patient in Monroe, and following Atkins’ arrival at St. Francis at 9:40 p.m., he died of an acute myocardial infarction at midnight.
Rainwater’s actions in interpreting Atkins’ electrocardiogram (“EKG”) data and other testing and his communication with Dr. Mouhaffel are the focus of this dispute. The expert testimony explained that an EKG has 12 leads including six limb leads made up of Lead I, Lead II, Lead III, AVR, AVL, AVF and six chest leads including VI, V2, V3, V4, V5 and V6, which show the electrical impulses of the heart on paper. Regarding the EKG taken at JPER at 3:20 p.m., some of the trial experts indicated Atkins’ ST wave elevations in Leads VI and V2, or contiguous leads, indicated that Atkins was suffering from what is called an ST segment myocardial infarction, MI or heart attack, also known as and referred to herein as a |sSTEMI. With a STEMI, described by experts as the most serious type of heart attack, the entire thickness of the affected heart muscle has its blood supply completely cut off, causing death to the muscle. The standard of care for a STEMI is to open the clogged artery as soon as possible which in this case would require Atkins’ transfer to the care of a cardiologist in Monroe.
Considering Atkins’ medical history, however, other experts testified that the elevated ST waves were also indicative of a past heart attack or cardiac ischemia, clouding the diagnosis of a presently occurring heart attack. They point to the presence of Q waves on the EKG in support of that possibility. The experts could agree that the accepted definition of a STEMI was an EKG that showed ST elevations of two millimeters or more in contiguous leads. All also agreed that Atkins’ EKG showed ST elevation of two millimeters or more in the VI and V2 leads. It was established that Rainwater failed to specifically communicate this information of the elevations to Dr. Mouhaffel before transporting Atkins to Monroe later that evening.
Additionally, Atkins’ increasing Tropo-nin levels shown from two heart enzyme blood tests at JPER were reviewed. Testimony indicated that Troponin is a protein found in the heart muscle cell which is released into the blood stream when disruption of the heart muscle cell occurs. It is a cardiac enzyme which is measured by blood analysis. When Troponin levels are above zero, muscle death has occurred. *785 Atkins’ initial .23 was a low but not normal finding, and this level increased to .78 after a second |4blood test, prompting Dr. Rainwater’s transfer of the patient to Monroe. In Monroe, by 11:20 p.m., Atkins’ Troponin level had increased to 1.46.
The record indicates that Atkins was given aspirin and a GI cocktail at 3:49 p.m. Nitroglycerin and morphine were also ordered to be given as needed for any further pain. Only the aspirin and GI cocktail were actually given to Aktins. A point of controversy was the issue of whether Dr. Rainwater, upon learning of the elevated Troponin, should have administered to Atkins clot buster medication and/or beta blockers which relax the heart. Dr. Rainwater did not give either treatment due to Atkins’ history of the recent GI testing and the contraindication of a possible biopsy from the colonoscopy which could cause bleeding and his lack of chest pain which subsided soon after arrival at JPER.
Suzanne, Brian and James Atkins (hereinafter “plaintiffs”), the widow and two sons of Atkins, submitted claims against Dr. Rainwater, Jackson Parish Hospital, Dr. Mouhaffel and St. Francis Medical Center to a medical review panel. On July 23, 2008, a divided panel issued the following opinion regarding Dr. Rainwater which was introduced into evidence and referenced through each physician’s testimony at trial.[2] The stated the claims against Dr. Rainwater were listed by the panel as follows:
1. Failure to properly read and interpret 12 lead EKG by failing to recognize ST elevations, resulting in delay of diagnosis and delay and treatment;
2. Failure to advise Dr. Mouhaffel that Mr. Atkins was having an ST elevation myocardial infarction (STEMI);
3.Failure to treat in an appropriate and timely matter resulting in his death;
|s4. Failure to consider emergency tPa treatment and treat with beta blocker, Plavix, nitroglycerin and blood thinners (Lovenox);
5. Failure to transfer for revasculari-zation.
The Majority and Dissent. Opinions read as follows regarding Dr. Rainwater:
MAJORITY OPINION (Drs. Chinnier (sic) and Bahro): The patient, Mr Glen Atkins, did not have clinical picture of acute myocardial infarction. The patient did have a history of colonoscopy the day before and recent normal stress test. The emergency department did not have a comparable prior EKG. Based upon the patient’s complaints and physical examination, Dr. Rainwater ordered lab work and EKG. Based upon the results of the EKG, Dr. Rainwater read the EKG with some elevated and ST and Q waves present which could have indicated recent myocardial infarction or old infarction with aneurysm. Dr. Rainwater ordered Mr. Atkins be treated with aspirin, nitroglycerin and a GI cocktail. The chest pain subsided. The initial Troponin was low .23. Dr. Rainwater was obviously concerned about heart disease. The presentation was suspect of heart disease, not indicative of myocardial infarction. Dr. Rainwater persuaded Mr. Atkins to remain at Jackson Parish Hospital and repeat Troponin test. While Mr. Atkins apparently wanted to be released, he did stay. The panel was concerned with his noncompliance of smoking while at the emergency department and desiring to be discharged against Dr. Rainwater’s *786 medical advice. Basically the patient remained pain free. Dr. Rainwater did consult with Dr. Mouhaffel following receipt of the second Troponin test results of .78. The panel notes an acute MI would result in much greater Troponin levels. Dr. Rainwater correctly transferred Mr. Atkins after the elevated Troponin test to a higher level care facility. Drs. Chinnier (sic) and Bahro find the evidence does not support the conclusion that Dr. Dirk Rainwater deviate[ed] from acceptable standard of care for an emergency medicine physician. DISSENT OPINION (Dr. McConnell): The standard of care for an emergency medicine physician who was presented with a patient such as Mr. Atkins with clinical and diagnostic results of Mr. Atkins requires that the emergency medicine physician, Dr. Rainwater, to recognize the reading of the 12 lead EKG as a potential myocardial infarction. The standard of care requires Dr. Rainwater, in this instance, to treat with thrombo-lyties and/or transfer the patient to a higher care facility for revascularization. This should have been done after the initial results were received. Of concern is that Dr. Rainwater has no previous EKG at which to look, the patient presented with chest pain and risk factors. The responsibility is on the emergency medicine physician to place the patient in the care of a cardiologist to intervene quickly if required. Dr. Rainwater did notlfido this. The possibility of an acute myocardial infarction was present and great. The deviation of emergency medicine standard of care by Dr. Rainwater was a factor in Mr. Atkins’ damages. More aggressive treatment was required by Dr. Rainwater.
On August 25, 2008, plaintiffs filed a wrongful death suit against Dr. Rainwater and his malpractice insurer, Louisiana Medical Mutual Insurance Company (“Defendants”) urging that Dr. Rainwater was negligent for his failure to properly recognize that Atkins was having a STEMI, and to require immediate treatment by a cardiologist and additional medication. The petition further alleges Dr. Rainwater’s failure to advise Dr. Mouhaffel of Atkins’ ST elevations. The matter was tried before a jury, which determined that Dr. Rainwater’s actions did not violate the standard of care of an emergency room physician.
Thereafter, plaintiffs filed a Motion for Judgment Notwithstanding the Verdict and/or New Trial and Remand to a Medical Review Panel. Plaintiffs argued that a judgment notwithstanding the verdict should be granted because the verdict was contrary to the overwhelming evidence in favor of plaintiffs. Plaintiffs also contended that a new trial should be granted because “the plaintiffs were ambushed” by a change in Dr. Rainwater’s testimony that directly contradicted testimony he had given to the medical review panel. Plaintiffs argued that this testimony raised a peremptory ground for a continuance which they sought unsuccessfully during the trial.
17Plaintiffs also argued that a new trial should be granted and the case remanded for reconsideration by the Medical Review Panel which had not considered Dr. Rainwater’s new testimony.[3]
After the trial court denied the motions on October 18, 2011, this appeal by plaintiffs ensued.

*787
Discussion

I.
On appeal, plaintiffs re-urge the argument that the evidence so strongly and overwhelmingly points in the plaintiffs’ favor that the trial court erred in failing to grant a judgment notwithstanding the verdict. Although plaintiffs’ primary claim charged that Dr. Rainwater should have decided to transport Atkins to the care of the cardiologist immediately upon receiving the EKG at 3:21 p.m., their emphasis on appeal focuses on two other alleged breaches of the standard of care for which no contrary defense expert testimony was presented. They assert that after receiving the second report of elevated Troponin at 7:15 p.m., Dr. Rainwater (1) failed to treat Atkins with beta blocker medication to relax the heart, and (2) failed to advise Dr. Mouhaffel about the ST elevations.
La. C.C.P. art. 1811 provides for the JNOV procedure. JNOV is warranted when the facts and inferences, viewed in the light most favorable to the party opposing the motion, are so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary | ¿verdict; the motion should be granted only when evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. Peterson v. Gibraltar Sav. and Loan, 98-1601 (La.5/18/99), 733 So.2d 1198. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991). Simply stated, a trial court can grant a JNOV only when a jury’s verdict is one which reasonable people could not have rendered; if reasonable people could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Jackson v. A.L. & W. Moore Trucking, 609 So.2d 1064 (La.App. 2d Cir.1992). The trial court’s refusal to render a judgment notwithstanding the verdict can only be overturned if it is manifestly erroneous. Peterson, supra. We interpret this to mean that our review evaluates all the evidence presented to the jury, which the trial court reviewed in denying the JNOV, to determine whether the trial court committed manifest error in concluding that reasonable people could have arrived at the jury verdict.
At trial, the following testimony was presented. Dr. Richard McConnell, plaintiffs’ expert in emergency room medicine, testified that he worked at Ochsner Medical Institution in New Orleans, Louisiana, a hospital with well over 1000 staff physicians. Dr. McConnell served on the medical review panel which reviewed Dr. Rainwater’s care of Atkins in the |flJPER and was the only panel member who concluded that Dr. Rainwater’s treatment fell below the standard of care.
Dr. McConnell testified that “the standard of care was not met for one major reason and that was the mis-interpretation of the electrocardiogram and not recognizing the ST segment MI, elevation MI.” Dr. Rainwater was required, according to Dr. McConnell, to interpret EKGs as a very basic aspect of emergency room care and failed to recognize that Atkins was having a particular kind of heart attack as shown by ST wave elevations and depressions. Dr. McConnell was also of the opinion that with the existence of the STEMI, Dr. Rainwater fell below the standard of care in placing Atkins in a hospital room for observation at 6:00 p.m. instead of immediately transporting him to a cardiologist’s care. He concluded that had Dr. *788 Rainwater followed the standard of care, Atkins would have survived.
Dr. McConnell explained that the recognized definition of a STEMI on an EKG included a 2 millimeter (hereinafter “mm”) elevation in the V or chest leads with two or more contiguous leads elevated. Dr. McConnell viewed Atkins’ 3:21 p.m. EKG and testified that this EKG showed ST elevations in five leads (Lead I, Lead II, AVL, VI and V2). Dr. McConnell observed that Lead I had an approximate 2 mm elevation, Lead II, 1.5 mm elevation, AVL just above 1 mm elevation and VI and V2 had over 2 mm elevations. Dr. McConnell testified that in his opinion, Atkins’ EKG clearly met the criteria for a STEMI. Dr. McConnell also testified that the EKG showed reciprocal ST depressions in AVR, V3, V4, V5 and V6, the | inopposite electrical response to the elevations in other areas of the heart which reinforced his view that the EKG showed a STEMI.
Dr. McConnell was shown the JPER computer interpretation of the EKG which indicated a heart attack behind the breast bone or anteroseptal infarct. Dr. McConnell explained that although these types of printouts are helpful and analyze electrical data, it is not necessary for an emergency room physician to accept what they say.
Dr. McConnell made the following statements:
• Atkins’ positive response to a GI cocktail and the initial Troponin level of .23, which was in the below normal reference range (range of Troponin values in normal people) for Jackson Parish Hospital did not relieve Dr. Rainwater of the burden of transporting the patient because of the ST elevations.
• Atkins’ GI history and negative stress test did not change Dr. McConnell’s opinion because of the abnormal EKG.
• The administration of aspirin alone was not reasonable treatment.
• Dr. Rainwater’s failure to inform Dr. Mouhaffel of ST elevations was misleading because that information “led him to believe that if there is anything going on it’s just partial occlusion of the vessel with ischemia and there was not going to be the need for immediate heart cath-eterization on arrival at St. Francis.”
• Dr. Rainwater did not recognize the fact that there were ST elevations in five leads.
• He disagreed that Atkins’ presentation was suspect of heart disease.
• He disagreed with the panel that an acute heart attack would have resulted in much greater Troponin levels.
• Beta blockers, Plavix or blood thinners would have increased Atkins’ chance of survival. If Dr. Rainwater did not believe Atkins was having a STEMI, it was nevertheless below the standard of care not to order a beta blocker based upon the elevated Troponin unless there were contraindications.
On cross-examination, Dr. McConnell acknowledged that Q waves were present in certain leads which also showed elevated ST waves, but testified that it was “hard to tell what the significance of that is.” Dr. | nMcConnell was of the opinion that Q waves “could show that this is just an intermediate phase in the current myocardial infarction between ST segments and isolation and Q wave and isolation.” He did not agree with Dr. Mouhaffel or the other two panel members that the Q waves indicated a previous recent heart attack but conceded that even if this were true, the presence of elevated ST segments still required that Atkins be transferred to a cardiologist.
Dr. McConnell indicated that VI and V2 ST elevations of “1 millimeter” are not “unusual” in men, and believed “that’s why *789 the consensus guidelines for diagnosing myocardial infarction require two millimeters of elevations in leads, VI, 2 and 3 to make the diagnosis of myocardial infarction.”
Dr. McConnell testified that Atkins’ BNP, a blood test which measures strain on the heart, indicated that Atkins had “increased strain on the heart muscle,” and “a degree of heart failure.” He conceded that although such heart failure can develop over time, it could also develop as a consequence of a sudden complete blockage of the blood supply to the heart muscle that creates a defective heart function. Dr. McConnell also stated that Atkins’ chest x-ray showed congestive heart failure which can also be a long-term problem or can develop over a short period of time. Although no autopsy was performed, Dr. McConnell believed that Atkins died from cardiogenic shock secondary to myocardial infarction, secondary to the degree of death of heart tissue.
|12Pr. Lawrence Palmer O’Meallie testified on behalf of plaintiffs as an expert in cardiology with knowledge of the standard of care related to the interpretation of EKG and ST elevation myocardial infarction. Dr. O’Meallie interpreted the EKG as showing “an acute ST segment myocardial infarction in progress.” He made the following observations:
• Wave depressions reflect a “reciprocation of the electrical waves that cause the heart to contract and relax,” and that the changes in the ST waves are the result of the heart being deprived of blood supply and oxygen.
• Atkins’ severe chest pain presented a classic case of heart attack. While the pain alleviation was unusual, the EKG should not have been ignored because pain is objective and the EKG is subjective.
• Atkins’ EKG showed damage to “at least one and probably a vessel at the top of the heart called the left anterior descending coronary artery.” The left anterior descending coronary artery “supplies the largest amount of tissue of the heart,” which when “afflicted it causes big time trouble.”
• The computer readout indicated “considerable high lateral infarct,” which should have alerted any physician “that he was dealing with something that was life threatening.”
• Q waves are impulses that are “going away from the heart,” which appear when “stunning of the myocardium occurs” before death of myocardial tissue. Instead of producing a positive R wave, during these events, a negative Q wave is produced. If a Q wave is addressed with intervention, the Q waves regenerate as heart function improves. If not addressed, the stunning will become the death of the tissue.
• Dr. O’Meallie did not believe that “this is an old infarct” because “the ST segment elevation and a good bit of depression are more associated with acuity, with acute problems, rather than chronic problems or a problem that’s run its course.” He stated that “if there had been a myocardial infarction two days before this man came to hospital, his traponin (sic) would have been fairly high.”
• He stated that “these are not normal ST segment elevations,” and should not be passed off as “gastroesophageal reflux,” when asked by the Atkins’ counsel if ST elevations in VI and V2 are considered “normal.”
1 lsDr. O’Meallie testified that the emergency room physician calling the cardiologist for a consult on this patient should have informed the cardiologist that “this patient is having a ST segment myocardial *790 infarction. If he didn’t realize that then he should say there’s some acuity on this EKG. I think you need to be involved.” Dr. O’Meallie testified that the standard of care required an emergency room physician to be able to interpret Atkins’ EKG and that if he, as a cardiologist, had been informed about or faxed this EKG, he would have “come right in and taken him to the cath lab.” Dr. O’Meallie concluded that if Dr. Rainwater had “acted promptly on this EKG and consulted a cardiologist right away and transferred Mr. Atkins right away to St. Francis,” Atkins would have survived.
On cross-examination, Dr. O’Meallie testified that the Q waves in VI and V2 were not that unusual because they were very “narrow,” so he did not think they “represented an inferior myocardial infarction.” He did not agree with Drs. Mouhaffel and Bahro that the Q waves represented a previous heart attack. He conceded that they “could have been from a remote heart attack,” but did not believe they were. Dr. O’Meallie agreed with defense counsel’s questions that “VI and V2 are the leads that with males are very often elevated” “as high as two millimeters,” but described this situation as “pathologic.”
Dr. Asad Mouhaffel, cardiologist at St. Francis Medical Center, testified on behalf of plaintiffs. He stated he spoke with Dr. Rainwater about Atkins at 7:30 p.m., and made the following statements and observations during his direct testimony:
114* Recalled Dr. Rainwater told him that the EKG showed ST depressions, but not ST elevations or Q waves.
• Identified Atkins’ EKG and stated that it showed both ST elevations in Lead I, Lead II, AVL and VI and V2, as well as Q waves.
• Explained that if the patient had chest pain, he would have wanted the emergency room physician to call him right away about the EKG and inform him of ST elevations, ST depressions and Q waves.
• Assumed that Atkins had chest pain.
• Indicated that if he had been told that the patient had ST elevations and continued to have chest pain, he would have acted differently and “taken the patient to the cath lab,” within 90 minutes.
• Because of what he was told about this patient, Dr. Mouhaffel was not at the hospital when the patient arrived.
• An EKG was ordered at St. Francis, but never done.
• Stated that the Troponin levels usually elevate after a heart attack; the fact that Atkins’ Troponin had risen was “suggestive” of an acute MI earlier that day.
On cross-examination, Dr. Mouhaffel testified that Dr. Rainwater informed him that Atkins had a full cardio workup six months previous which was negative. This indicated to Dr. Mouhaffel that Atkins had no significant blockage or heart disease. According to Dr. Mouhaffel, Dr. Rainwater informed him that Atkins was experiencing gastric pain for which he had received a GI cocktail. Dr. Rainwater informed Dr. Mouhaffel that he convinced Atkins to be admitted for a second set of enzymes after his first set was “negative.” Because the second test showed “slightly positive” enzymes, Dr. Rainwater indicated that he was worried about the patient and requested transfer. Dr. Mouhaffel testified that Dr. Rainwater informed him that Atkins was pain free at the time of their conversation. Dr. Mouhaffel testified that pain is significant because it possibly tells you whether the heart attack is current or is completed. Atkins was also pain free for about 45 minutes after his arrival at St. Francis.
*791 |1sDr. Mouhaffel testified that there are many causes for ST elevation for which he does not automatically perform a heart cath. He looks at “the whole picture” and if the “picture is consistent with acute MI then I would do that.” He would consider if the patient has chest pain, when the pain began and whether the EKG changes persist.
Dr. Mouhaffel identified Q waves on Atkins’ EKG and recalled that they were in VI, V2, Lead I, Lead II and the AVL. Dr. Mouhaffel testified that Q waves take time to develop. He would not consider throm-bolytic or clot buster medication in a patient who had biopsies taken during a colo-noscopy the day before due to the risk of bleeding. Dr. Mouhaffel testified that if Atkins had come into St. Francis pain free, with the EKG changes “suspicious like this” and the Troponin slightly elevated, he “probably” would have taken him to the cath lab had he seen him. Dr. Mouhaffel admitted that in his deposition he thought that Atkins had experienced a heart attack a few days before March 7, 2006.
Dr. Mouhaffel testified that elevated Troponin could be suggestive of an acute MI that day. Because he was told that there were ST depressions in the lateral lead, he thought there was no need to take the patient to the cath lab because that type of heart attack is not urgent.
The defense presented the testimony of two expert witnesses, who served on the Medical Review Panel, in support of its case. Dr. Abdul Bahro testified with a speciality in cardiology and Dr. Lawrence Chenier, a staff physician and Director of the Emergency Room at Madison Parish Hospital, was qualified as an expert in emergency room medicine.
LfiFrom the defense experts’ testimony the following fact considerations and opinions were given. Based upon the EKG, ST elevations and reciprocal depressions, Dr. Rainwater should have considered that Atkins could be having a STEMI and that it was his heart that was causing his initial pain symptoms. The .23 Troponin level was not a normal finding. The change in Troponin level from .23 to .78 was significant, and Dr. Rainwater’s decision to transport the patient only became necessary after the change in Troponin was recorded. The presence of Q waves was indicative of prior myocardial damage, which could have been of a recent origin before March 7. Nothing in the JPER medical records indicated Dr. Rainwater’s recognition of ST elevations or that the ST depressions were reciprocal. The standard of care for emergency room physicians required that Dr. Rainwater inform the cardiologist of significant abnormalities in the EKG such as the ST elevations and reciprocal depressions.
Regardless of the possibility of the STEMI, the experts offered the following in Dr. Rainwater’s defense. A clear STEMI EKG would show an ST elevation of 8 to 9 mm. Waiting for the second cardiac enzyme results for Troponin was appropriate. Atkins’ report of a normal stress test six months earlier was a significant consideration discounting an acute MI. It was uncommon for an acute heart attack patient’s pain to subside. Therefore, Atkins presented an atypical clinical picture of a STEMI patient.
Dr. Bahro’s testimony regarding Dr. Rainwater’s failure to give Atkins beta blockers is disputed by the parties. On examination by plaintiffs’ counsel in deposition, Dr. Bahro testified that he believed the 117standard of care required the administration of a beta blocker to Atkins after the EKG showed abnormalities and “with his chest pain.” He testified that the failure to give Atkins a beta blocker was a failure to meet the standard of care. However, from later questioning from de *792 fense counsel, Dr. Bahro clarified that his opinion regarding the standard of care for administering beta blockers applied only if the patient had recurring pain.
Finally, in support of the defendant’s case, Dr. Rainwater, an expert in emergency room medicine, testified that he had been employed full-time by Jackson Parish Hospital in Jonesboro since November of 2003. Dr. Rainwater explained that he was also a hospitalist who took care of all of the floor patients at the hospital.
Dr. Rainwater testified that he recalled that Atkins presented to the emergency room midafternoon while he was on hospital rounds and that he saw Atkins approximately 15 minutes after he came into the emergency room. Dr. Rainwater was informed by the RN that he had epigastric-type pain and a history of reflux. Atkins was sweating and reported a pain of 8 out of 10. Yet, by the time Dr. Rainwater first saw Atkins, the patient’s pain had subsided. Dr. Rainwater testified to the history that Atkins gave him as noted above.
Dr. Rainwater explained that the significance of Atkins’ normal stress test is that it indicates with 95 percent accuracy that there is no blockage. Dr. Rainwater testified that it was rare to have a patient who had undergone so much testing, and he took the positive results of those tests as a “good sign” for Atkins. Dr. Rainwater informed Atkins that his EKG was not 11snormal and “some things I was seeing on there that didn’t really line up with him having a completely normal stress test six months before ... but it didn’t appear that he was having an acute MI or acute heart attack.” Dr. Rainwater informed Atkins to let a nurse know if he had any more pain.
When Dr. Rainwater later checked on the results of Atkins’ lab work, he saw Atkins outside the hospital smoking and asked him to step back inside. Atkins informed Dr. Rainwater that he was having no pain and wanted to go home. Dr. Rainwater informed Atkins that his Tropo-nin level was a “detectible number,” although low. Dr. Rainwater ultimately convinced Atkins to remain in the hospital for further lab tests.
Dr. Rainwater was thoroughly questioned about his treatment of Atkins and his interpretation of the EKG. Dr. Rainwater disagreed with Drs. O’Meallie and McConnell that he “missed a classic ST elevation ML” He testified that the “fair amount of elevation on the EKG” could mean ischemia or pericarditis. He considered that Atkins was pain free and had Q waves which in VI and V2 were “caused by dead heart muscle.” This indicated to Dr. Rainwater that “this MI had been there for a while.”
Dr. Rainwater testified that Atkins had “some” elevation in VI and V2 of “approximately” 2 mm. He explained that “any other place in the EKG those would be significant but it’s a normal variant in males to have elevated ST elevation in VI and V2.” Dr. Rainwater explained that “standardized guidelines say that three millimeters, up to three millimeters can be normal on ST elevation in VI and V2.” He further testified that “by definition,” Atkins did not have “two millimeters of elevation in any | ^contiguous leads that [he] saw,” and that “you can’t count VI and V2” because “those can be normal ST elevation.”
On cross-examination, Dr. Rainwater persisted that “he saw the ST elevation in all of his leads.” From his earlier deposition, Dr. Rainwater read into the record the following statements regarding his interpretation of the EKG as follows:
Answer: When you get two [E] KG changes based on ischemia based on hy *793 pertrophy to the ventricles, multiple things you can read in the EKG. But he was showing some ST depressions in several of his leads and he was showing some minimal ST elevation in one of his leads.
When questioned about these statements, Dr. Rainwater stated that he “may have meant [ST elevation in] some of his leads.” Dr. Rainwater insisted that in another portion of his deposition, he stated that “all of the leads were elevated” and that he recognized all of the ST elevations at the time of the event. Dr. Rainwater testified that he believed that his statement in the medical record about “nonspecific ST changes” was a sufficient reference to ST elevations.
Dr. Rainwater also admitted that he made the following statement in his deposition:
He didn’t warrant having emergent thrombolytic because he didn’t have at least two millimeters of elevation in two contiguous leads. He did have elevation but in my opinion they weren’t enough to warrant TNK, that’s tenecteplase that we have at our hospital.
Dr. Rainwater explained that he did not think Atkins had two leads with 2 mm of elevation because “VI and V2 can be physiologic.” He testified that “we’re trained [that] VI and V2 in most men can be elevated up to [ 203 mm. So you don’t just jump and treat something like that because that can be completely normal.”
Regarding the administration of medication, Dr. Rainwater did not give Atkins a beta blocker because he did not believe he was having a STEMI and due to his smoking history and underlying lung issues, and chose not to give Atkins anti-platelet medication because of the possibility of a biopsy from his gastric procedure the day before which could cause bleeding. Dr. Rainwater did not administer thrombolytic or elot-busting medication to Atkins because he did not believe he was having a STEMI and due to the possibility of the biopsy the day before.
Dr. Rainwater could not specifically recall what information he gave to Dr. Mou-haffel about the EKG. He remembered that he told Dr. Mouhaffel that the EKG showed “ST depressions, non-specific ST changes — uh a multitude of things.” Dr. Rainwater testified that he told Dr. Mou-haffel that Atkins had “an abnormal EKG” and his concern that Atkins was having “ischemic changes.” He “may have told him about Q waves.” Dr. Rainwater did state that he told Dr. Mouhaffel that Atkins needed to be seen that night.
Plaintiffs’ first claim of malpractice against Dr. Rainwater concerned his misinterpretation of the EKG. This also involves plaintiffs’ argument that they were ambushed at trial by Dr. Rainwater’s newly revealed explanation that he considered the ST elevations in VI and V2 as normal in males. From the entirety of the expert testimony, Dr. Rainwater’s belated attempt to justify his discounting of the VI and V2 elevations was shown to |21be error and below the standard of care for his required understanding and interpretation of an EKG. All of the other doctors indicated that the elevation in those two leads raised the possibility of a STEMI. Nevertheless, regardless of the lack of weight which Dr. Rainwater placed upon these elevations, he did treat Atkins for the possibility of a heart attack. This was demonstrated by his decision to perform the second test for Troponin and his discussions with Atkins convincing him to remain at the hospital.
The defense presented various other factors in addition to the interpretation of the EKG, which were asserted as justifications for Dr. Rainwater’s delay in sending At *794 kins to the care of a cardiologist. Most significant throughout this tragic course of events was Atkins’ atypical presentation by a patient experiencing a present heart attack. Atkins’ pain subsided soon after reaching the hospital. His GI history and the possible relief he received by the GI cocktail clouded the situation. Likewise, the lack of a prior EKG and Atkins’ successful stress test weighed into Dr. Rainwater’s diagnostic evaluation. Finally, Dr. Rainwater’s recognition of Q waves on the EKG and the .23 Troponin level, while indicative of the heart problem, allowed for the decision to obtain the second cardiac enzyme measure.
From our review of the entirety of the evidence, therefore, we find that reasonable people could conclude that Dr. Rainwater’s decision to delay Atkins’ transfer to Monroe did not fall below the standard of care. The trial court was not in error in failing to grant the JNOV on that issue.
^Plaintiffs’ other claims for malpractice concern Dr. Rainwater’s actions after the rise in the Troponin level was determined. At this point, Dr. Rainwater properly recognized Atkins’ need of the care of a cardiologist. Nevertheless, he did not treat Atkins with beta blocker medications to relax the heart. Regarding this close issue, Dr. Bahro’s disputed testimony did state that a decision to administer the beta blockers could hinge on the patient’s report of chest pain. During Dr. Rainwater’s consultation with Atkins concerning the decision to go to Monroe, Dr. Rainwater testified that Atkins was not reporting chest pain. Therefore, we cannot say from this evidence and the expert opinion that the jury’s choice exonerating Dr. Rainwater’s decision was unreasonable.
Finally, we agree with plaintiffs’ assessment of the testimony of both Dr. Mouhaf-fel and Dr. Rainwater that Dr. Mouhaffel was not advised of the ST elevations in his conversation with Dr. Rainwater. This fact alone, however, is not the only consideration for this alleged breach of the standard of care given the other facts concerning the communication between the two doctors. This issue was made more difficult by the lack of any testimony of Dr. Mouhaffel’s standard of care for his expected actions based upon the information he did receive.
Most damaging to Dr. Rainwater’s defense of this issue was the following testimony of his own expert, Dr. Chenier:
Q. Now, and you would agree that your job is to properly inform the cardiologist about what you see on the EKG. Correct?
A. Yes.
Q. And the last thing you want to do is mislead the cardiologist about what’s going on. Isn’t that correct?
las A. You don’t want to mislead anyone.
No.
Q. Right. So if you were communicating to a cardiologist about this — this EKG, wouldn’t you want to describe all of the significant abnormalities?
A. Yes.
Q. And wouldn’t those significant abnormalities include that he had both ST elevations and ST depressions?
A. True.
Q. And wouldn’t you want to tell the cardiologist that it looked to you that the ST depressions were reciprocal depressions?
A. Not necessarily, but at least mention it, yes.
Q. Okay. And do you believe that it’s the standard of care expected of an emergency room physician to tell a consulting cardiologist the signifi *795 cant changes that you see on the EKG?
A. Yes.
This testimony further confirms the clear opinion of all the medical experts that Dr. Rainwater should not have missed or discounted the ST elevations in the VI and V2 leads. Nevertheless, even with Dr. O’Meallie’s similar view that Dr. Rainwater missed a proper emphasis on the elevations, Dr. O’Meallie indicated that Dr. Mouhaffel needed to be advised at least of the “acuity of this EKG” and of Dr. Rainwater’s concern that Atkins needed evaluation by the cardiologist. Facts indicating that urgency are present in the record. Clearly, Dr. Mouhaffel knew that the rise in the Troponin prompted the patient transfer and was a present ongoing event. Dr. Rainwater did discuss the EKG and never indicated that the EKG was normal. Most importantly, Dr. Rainwater testified that he told Dr. Mouhaffel that Atkins should be seen that evening despite the continuous subsidence of his early afternoon chest pain.
While we believe that this issue of communication between the doctors presents the closest issue regarding Dr. Rainwater’s breach of the ^standard of care, we again cannot conclude that reasonable people could not have arrived at the jury’s verdict. Accordingly, we affirm the trial court’s ruling on the JNOV and the jury’s verdict, finding no manifest error.
II.
Plaintiffs also argue that the trial court erred in refusing to continue the trial on peremptory grounds for the short time needed for plaintiffs to get a rebuttal witness to address Rainwater’s testimony that ST elevation in males was normal. Further, plaintiffs contend that the trial court erred in failing to grant its motion for new trial. Specifically, plaintiffs urge that this court should vacate the judgment of the trial court and require that a medical review panel reconsider the case based upon Dr. Rainwater’s revised defense or give no weight to the testimony of Drs. Bahro and Chenier and consider the testimony de novo.
Generally, new trials are granted in the interest of justice and are largely left to the discretion of the trial judge. Succession of Robinson, 186 La. 389, 172 So. 429 (1936). Trial courts are vested with the power to grant new trials on either discretionary or peremptory grounds. La. C.C.P. arts. 1972, 1973.
La. C.C.P. art. 1972 provides as a peremptory ground for granting a new trial the discovery of evidence important to the cause, which could not, with due diligence, have been obtained before or during the trial. Additionally, when a trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered under the discretionary grounds of La. C.C.P. art. 1973. Horton v. Mayeaux, 05-1704 (La.5/30/06), 931 So.2d 338; Lamb v. Lamb, 430 So.2d 51 (La.1983).
La. C.C.P. art. 1602 provides for the peremptory grounds for a continuance as follows:
A continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance.
A party who seeks a continuance because the party has been unable to obtain material evidence must show what evidence he could not obtain, and how it is material. Knighten v. Knighten, 447 So.2d *796 584 (La.App. 2d Cir.1984), writ denied, 448 So.2d 1303 (La.1984). The evidence must be vital, St. Paul Fire & Marine Ins. Co. v. Roberts, 331 So.2d 529 (La.App. 1st Cir.1976), and noncumulative evidence which could affect the outcome of the case. Burgess v. City of Baton Rouge, 477 So.2d 143 (La.App. 1st Cir.1985); Bernard v. Merit Drilling, Co., 434 So.2d 1282 (La.App. 3d Cir.1983); Thomas v. Winn Dixie Louisiana, Inc., 407 So.2d 520 (La.App. 4th Cir.1981); Almerico v. Highlands Ins. Co., 388 So.2d 1176 (La.App. 4th Cir.1980).
The grounds for plaintiffs’ Motions for New Trial and Continuance focused on Dr. Rainwater’s trial testimony that the ST elevations in VI and V2 were normal in males, which counsel claimed “caught me by surprise.” On the morning following the completion of Dr. Rainwater’s testimony, the defense informed plaintiffs’ counsel of its intent to rest without the testimony of a final expert witness. Plaintiffs’ counsel objected and 12rjnformed the court of his intention to utilize the witness to rebut Dr. Rainwater’s testimony. The court gave counsel until 10:30 a.m. to obtain a rebuttal witness, but plaintiffs were unable to do so. Plaintiffs lodged an objection on the record.
After reconvening the trial, the court denied plaintiffs’ motion after orally concluding:
The Court feels that Dr. Carlton’s testimony would probably be cumulative as to the defendant’s side. They have the right to choose whether or not to call their expert witness. Plaintiffs on the other hand had an opportunity to require both of their doctors to remain in Court. I understand the cost of that. In case they needed a rebuttal witness they chose not to do that and I understand because the two doctors from New Orleans and the cost factor would have been extensive, other than, but I cannot require the defendant to call or not call witnesses. So the Court for the record will deny Mr. Kullman’s request to continue this case in order that he might get a rebuttal witness here in order for the trial to proceed to its conclusion.
In support of the motion for new trial, plaintiffs submitted those portions of:
1) Dr. Rainwater’s deposition in which he indicated that Atkins did not have “at least two millimeters of elevation in two contiguous leads.”
2) Dr. Bahro’s deposition, stating that Dr. Rainwater should have notified the cardiologist of the ST elevations.
3) Dr. Chenier’s deposition, indicating that Atkins’ EKG showed ST elevations of 2 millimeters or more in VI and V2 and that Dr. Rainwater said nothing to Dr. Mouhaffel about ST elevations.
Plaintiffs also attached the affidavits of
Drs. O’Meallie and McConnell which stated each physician’s inability to return for testimony on the last day of trial and their surprise at Dr. Rainwater’s trial admission. The affidavits also included the physicians’ conclusions that it was 127malpractice for Dr. Rainwater to rule out a STEMI, fail to recognize complete blockage in the artery that supplies the largest amount of heart tissue and presume that the elevated ST waves were normal.
We agree with plaintiffs that the issue of the pathologic elevation in males was a new issue raised at trial. Most telling, in the depositions of both defense experts presented at trial, the issue was not examined. Nevertheless, even when the issue was touched upon at trial in the cross-examination of the plaintiffs’ experts, male ST elevation was not shown as a justification for discounting the VI and V2 leads on Atkins’ EKG. All expert testimony indicated that the elevation of those leads was a factor that was required to be recognized *797 as indicative of a possible STEMI. Dr. Rainwater was cross-examined thoroughly, and his pretrial testimony presented on cross to the jury gave no reliance on a male pathologic elevation. Whether Dr. Rainwater missed the elevation because of the lack of his interpretive skill for an EKG or his reliance on a pathologic explanation, his overall conduct as reviewed above which ultimately resulted in his transfer of the patient to Monroe can be viewed as meeting the standard of care. We find, therefore, that this newly raised issue at trial did not result in prejudice to plaintiffs or a miscarriage of justice. The trial court did not abuse its discretion in rejecting the request for a continuance or in its denial of the motion for new trial.

Conclusion

For the foregoing reasons, the judgment of the trial court denying plaintiffs’ Motion for Judgment Notwithstanding the Verdict and/or New |28Trial is affirmed. Costs of this appeal are assessed to plaintiffs.
AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, CARAWAY, PITMAN and SEXTON, JJ.
Rehearing denied.

. A nuclear heart stress test involves the injection of dye into the arm and placement of the patient on a treadmill for a certain amount of time.

. The medical review panel unanimously determined that the remaining defendants did not breach the standard of care.

. Plaintiffs also sought a new trial on the peremptory grounds that new evidence (Atkins' August 10, 2005 EKG which was introduced into evidence by Dr. Rainwater) had been discovered, since the trial.