STONE, J. '
11 Jane Newman and her three adult children, Linda Canady, Henry Newman, and Darrell Newman, filed suit against Louisiana State University Health Sciences Center-Shreveport and Dr. Patrick Juneau, III, M.D., alleging that the hospital’s and doctor’s negligence caused the death of Clifton Newman. A jury found that neither the hospital’s nor the doctor’s actions breached the standard of care. For the following reasons, we affirm.
FACTS AND PROCEDURAL BACKGROUND
On March 30, 2009, Clifton Newman (“Newman”) was involved in a single-vehicle accident in Lake Charles, Louisiana. He was transported on a spine board with an Ambu Perfit Ace cervical collar neck brace (“C-collar”) to Christas St. Patrick Hospital. Radiographic imaging ‘ revealed Newman suffered from an unstable fracture of his neck. Newman was subsequently transported by ambulance to Lafayette General Hospital to the care of Dr. Patrick Juneau, III (“Dr. Juneau”), a board-certified neurosurgeon. Dr. Juneau evaluated Newman and determined he had a serious displaced fracture of the cervical spine. Dr. Juneau concluded the complexity of Newman’s spine injuries required neurosurgical intervention and that Newman should be treated at a definitive neurosurgical center. Dr. Juneau'called Louisiana State University Health Sciences Center in Shreveport (“LSUHSC”) to discuss Newman’s condition. It was ultimately decided that Newman should be transferred to LSUHSC. Newman remained in. the C-collar on the spine board and was transported to. LSUHSC by ground ambulance.
*119 Upon arrival at LSUHSC, the on-call senior resident issued an order for' Newman to undergo a myelogram as well as an order stating "Miami J ^collar [at] all times” for Newman’s neck. At all times pertinent. to this matter, Newman remained in the C-collar that he was initially transported in. Newman was then transferred to the care of Dr. David E. Connor (“Dr. Connor”), a first-year neurosurgery resident. In order to accomplish the myelo-gram, Dr. Connor ordered Newman be turned from his back onto his stomach (“repositioning”). Due to the nature of Newman’s condition and supposed injury, it was critical that his neck remain immobile and not sustain any movement during the repositioning, to avoid a terminal spinal cord injury. Assisting with the repositioning were two radiologists, two intensive care unit nurses, and two radiology technicians. After the repositioning, Newman’s blood pressure significantly dropped and the myelogram could not be completed. Newman subsequently died hours later on April 1,2009.
Newman’s wife and children (“Plaintiffs”) filed a complaint and a medical review panel (“MRP”) consisting of three neurosurgeons was convened. The main contention in Plaintiffs’ complaint was that Newman was never placed in a Miami J collar (“Miami J collar”) as ordered. Plaintiffs further complained that Dr. Conner: 1) failed to give any written or oral instructions regarding proper medical management and repositioning of Newman; 2) failed to supervise or oversee the myelo-gram procedure; and 3) failed to supervise Newman’s neck as he was turned from his back to the prone position. On August 24, 2012, the MRP rendered a unanimous opinion wherein • it ■ found that neither LSUHSC nor Dr. Juneau breached the applicable standard of. care during their treatment of Newman. The MRP found Newman did not suffer from a traumatic fracture or any significant dislocation at the C6-C7 segment of his spine (“C6-7”); that Newman was [¿properly transported and turned with appropriate immobilization; and that there was no neurological deterioration as a result of the transport to LSUHSC. Additionally, the MRP found that the decision to turn Newman onto his stomach to perform the myelogram was proper procedure.
On November 14, 2012, Plaintiffs filed a medical malpractice lawsuit against LSUHSC and Dr. Juneau.[1] On April 21, 2016, a jury found LSUHSC did not breach the applicable standard of care in its treatment of Newman. On May 2, 2016, Plaintiffs filed a motion for judgment notwithstanding the verdict (“JNOV”) and, alternatively, for a new trial. However, the trial court denied the motion. This appeal followed.
DISCUSSION
Plaintiffs argue the jury’s verdict wqs manifestly erroneous based on expert testimony and, therefore, the trial court was required to substitute its judgment for that of the jury. Specifically, Plaintiffs argue there was overwhelming evidence indicating LSUHSC breached the standard of care by allowing Dr. Connor,-a first-year neurosurgery resident, to oversee Newman, and by failing to place Newman in a Miami J collar.
A JNOV is warranted when the facts and inferences, viewed in the light most favorable to the party opposing the motion, are so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; the motion should be granted only when evidence points so strongly in favor *120 of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. Peterson v. Gibraltar Sav. and Loan, 98-1601 (La. 06/18/99), 733 So.2d 1198; Atkins v. Louisiana Mut. Med. Ins. Co., 47,374 (La. App. 2 Cir. 11/07/12), 105 So.3d 781, writ denied, 2013-0341 (La. 04/01/13), 110 So.3d 586. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men, in the exercise of impartial judgment, might reach different conclusions, the motion should be denied. Anderson v. New Orleans Public Serv., Inc., 583 So.2d 829 (La. 1991); Atkins, supra. Simply stated, a trial court can grant a JNOV only when a jury’s verdict is one which reasonable people could not have rendered; if reasonable people could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Atkins, supra; Jackson v. A.L. & W. Moore Trucking, 609 So.2d 1064 (La. App. 2 Cir. 1992).
The motion for a new trial requires a less stringent test than for a JNOV. A new trial may be granted in any case if there is good ground therefor. La. C.C.P. art. 1974. Whether to grant a new trial requires a discretionary balancing of many factors. Dowles v. Conagra, Inc., 43,074 (La. App. 2 Cir. 03/26/08), 980 So.2d 180; Gibson v. Bossier City Gen. Hosp., 594 So.2d 1332 (La. App. 2 Cir. 1991). Unlike the standard applicable to a motion for JNOV, the trial judge may evaluate evidence without favoring any party and draw his own inferences and conclusions. Perhaps the significant authority is the ability to assess the credibility of witnesses when determining whether to grant or deny the motion for new trial. Dowles, supra. The trial court’s discretion in ruling on a motion for new trial is great, and its decision will not be disturbed on appeal absent an abuse of that discretion. Id.
LTo establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794.[2]
The jury’s finding in a medical malpractice case is subject to manifest error review; it cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State through Dep’t of Transp. & Dev., 617 So.2d 880 (La. 1993); Bailey v. Donley, 44,919 (La. App. 2 Cir. 12/09/09), 26 So.3d 987, 990-91. In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety and find that (1) a reasonable *121 factual basis does not exist for the finding; and, (2) the record establishes that the fact finder is clearly wrong or manifestly erroneous. Id. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217 (La. 04/03/02), 816 So.2d 270; Bailey, supra.
| fiExpert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Samaha v. Ran, 2007-1726 (La. 02/26/08), 977 So.2d 880.
Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. Mistich v. Volkswagen of Germany, Inc., 1995-0939 (La. 01/29/96), 666 So.2d 1073, opinion reinstated on reh’g, 95-0939 (La. 11/25/96), 682 So.2d 239; Valentine v. Raeford Farms of La., LLC, 50,698 (La. App. 2 Cir. 08/15/16), 201 So.3d 325, 347, writs denied, 2016-1924, 1925 (La. 12/16/16), 212 So.3d 1171, 2016 WL 7638427, 7638429. A fact finder may evaluate expert testimony by the same principles that apply to other witnesses and has great discretion to accept or reject expert or lay opinion. Id. The reviewing court will give great deference to the conclusions of the trier of fact. Bailey, supra.
Plaintiffs began their case in chief by showing the jury the previously recorded video deposition of Dr. Juneau, the board-certified neurosurgeon who was on call the night of Newman’s car accident. In his deposition, Dr. Juneau stated that, “by simply examining Newman,” he could tell Newman had a serious spinal injury. Based on his review of the plane X-ray of the cervical spine, Dr. Juneau .said- there was calcification of Newman’s ligament which caused extreme stiffness in his spine. Dr. Juneau classified Newman as having a highly unstable fracture at the C6-7 but stated that the word “fracture” was being used loosely and that “unstable injury” was a more accurate assessment. Dr. Juneau also described what he believed to be 17an abnormal lesion at the C2 segment of Newman’s spine (“C2”). Dr. Juneau was unsure how Newman passed away, but stated that he knew Newman had a cardiac issue. Dr. Juneau revealed that Newman had a history of colon cancer, and was leaving a chemotherapy treatment at the time of his accident. Dr. Juneau further testified that Newman had a history of heart disease, hypertension, and had a pacemaker. Dr. Juneau conceded the MRP’s conclusion on the matter “makes a lot of sense.” He further testified that ordering the myelogram was absolutely necessary because an MRI was not possible due to Newman’s pacemaker.
Dr. Robert Hudgins (“Dr. Hudgins”), another board-certified neurosurgeon, testified that given the severity of Newman’s injuries, it was unreasonable for him to be placed in the care of a first-year neuro-surgical resident. According to Dr. Hud-gins, a board-certified neurosurgeon should have made decisions about Newman’s care and directed the myelogram procedure. Dr. Hudgins stated Newman suffered from a cardiac complication that arose from his blood pressure dropping during the repositioning. Dr. Hudgins opined that a C2 lateral puncture was more appropriate and safer than a myelo-gram, but admitted that he did not believe the decision to perform a myelogram was substandard care. Notwithstanding, he testified that there was no evidence in the medical record of any acute worsening of Newman’s condition until he was actually *122 repositioned for the myelogram procedure. Dr. Hudgins also testified- that there was an “obvious” fracture at C6-7 despite the statement by the MRP that there was no traumatic fracture or significant dislocation at 06-7.
Heather Bradley (“Nurse Bradley”),' one of the 'registered nurses responsible for Newman’s care at LSUHSC and who assisted with the |srepositioning, testified that she received an order which stated “Miami J collar @ all times.” She admitted that not following the order for the Miami J collar would be a violation of the order. Nurse Bradley testified that Dr. Connor approved the myelogram procedure for Newman and gave the authorization for him to be placed on his stomach. Nurse Bradley could not recall if she or the other nurse had held Newman’s head during repositioning but knew definitively that one of them did. Additionally, Nurse Bradley stated she was surprised the MRP found there was no fracture at C6-7 because she had treated Newman as a patient with a broken neck.
Dr. Mardjohan Hardjasudarma (“Dr. Hardjasudarma”), a board-certified neuro-radiologist, was also present during the repositioning. Dr, Hardjasudarma testified that Newman had two' fractures—one was a fracture dislocation at the C6-7 level, and the other was a fracture of C2. Dr. Hardjasudarma stated that once Newman was positioned on his stomach, it was his job to perform the myelogram by injecting the contrast fluid into Newman’s back. Dr. Hardjasudarma testified that he had only injected.a small amount of the contrast into Newman when Newman’s blood pressure and other vital signs'started decreasing. The myelogram was stopped and Newman was placed on his back. Dr. Hardjasudarma also testified that there was no indication that the manner in which he injected the contrast for the myelogram was improper. He stated that if in this case the repositioning was done incorrectly, it could trigger a failure of the autonomous nervous system leading to a heart attack.
Dr. Rand M. Voorhies (“Dr. Voorhies”), a board-certified neurosurgeon who served on the MRP, also testified for LSUHSC. Dr. | gVoorhies expressed a desire to clarify the MRP’s opinion for the jury with regard to the fracture at C6-7. He testified as follows:
There was no fracture through the vertebral bones at C6 and C7. There was no fracture.through the actual bones. This particular patient had a very advanced form of—-let’s use the word arthritis ... It’s a relatively rare, very advanced form of arthritis which essentially leads to a calcification of all the ligaments ... so that a shell of calcium grew around the spine. Everything, therefore, very, very stiff and inflexible. There was, I believe a fracture through the ligament, the calcified shell, around the vertebrae. There was no actual fracture in the vertebral bones themselves at C6-7. Now, confusing the whole issue is there was a fracture at the base of C-2 ,.. That we believe was old and long-standing and had actually sort of healed over. So the clarification of the opinion of the panel is that there was a fracture through the ligament which was abnormally calcified .., This- patient had a very advanced form of arthritis and, as a result, the ligaments were calcified; - And what fractured was actually that ligament.
Dr. Voorhies conceded that the MRP’s opinion was seemingly incomplete, but reiterated for the jury that there was a fracture but that it was through the calcified ligament, and not through the actual bone of C6-7.
Dr. Voorhies further testified that it would not be a violation of the standard of *123 care if the neurosurgical nurse held Newman’s head and neck during the repositioning for the myelogram, and stated he recommends such action from the nurse. He also stated that even if the head and neck are held with extreme caution, there can be fluctuations in blood pressure during the repositioning for someone with a neck injury. Additionally, Dr. Voorhies testified that, in his opinion, the standard of care does not require a neurosurgeon either to be present during the myelogram or to be holding the neck of a patient with a neck injury. Dr. Voorhies further explained that a C2 lateral puncture is an uncommonly performed procedure, and in Newman’s case was unsafe. Specifically, because Newman had a history of cancer, it was possible that the lesion at the C2 was a tumor. Moreover, a |inC2 lateral puncture would have required that the C-collar be removed, which would have increased the risk of complications.
Dr. Voorhies stated that because the term “Miami J” is so common, it is sometimes used as a synonym for a hard collar. He believed the chief resident was using “Miami J” in the more broad sense of a hard collar rather than suggesting that the C-collar that Newman was wearing be switched out for a collar bearing the Miami J'brand. He also stated that Nurse Bradley’s acknowledgment of the violation of the doctor’s order would not suggest there was substandard care by the nursing staff because he assumed there is no material difference between the two collars. Notwithstanding, Dr.-Voorhies conceded that if the Ambu Perfit Ace C-collar used on Newman, was significantly inferior to a Miami J collar, not following the order would have been substandard care.
Dr. Eric W. Wolf, II (“Dr. Wolf’), another board-certified neurosurgeon, was the last to testify at trial. Dr. Wolf made the following observation concerning whether a neurosurgeon should have been present during Newman’s repositioning:
While I think that [having a neurosurgeon present during repositioning of a patient] is probably a frequent occurrence, it is not in my opinion below the standard of care for one to be absent, provided that there are adequate staff familiar with the procedure at hand. And at the time this myelogram was performed, you had -two intensive care unit nurses, you had two radiology techs, and two radiology professionals.
Dr. Wolf further testified about the moments leading up to Newman’s death. He stated that, based on his review of the LSUHSC medical records, it took around 55 minutes from the time Newman was repositioned before his blood pressure began to decrease. Based bn the records of the preceding day, Dr. Wolf stated there had been a gradual downtrend in Newman’s overall blood | ^pressure prior to the myelogram. However, the decrease in blood pressure was exacerbated by the repositioning of Newman onto his stomach. Newman also had quadriparesis which further affected his cardiovascular system. Dr. Wolf pointed out that a progressive decrease in urine was noted in Newman’s records, which indicated his kidneys were not receiving adequate blood flow. According to Dr. Wolf, this was indicative of either lower blood pressure or lower blood volume. Dr. Wolf testified that, in his opinion, the tilting of Newman during the mye-logram procedure should have improved his blood pressure.
Dr. Wolf also opined that Newman was experiencing neurogenic shock prior to the myelogram. He stated this was “manifest by the progressive lowering of the blood pressures, requiring more and more fluids, more aggressive fluids.” Additionally, Dr. Wolf noted that Newman’s pacemaker was programmed at a pacer rate of about 62 *124 beats per minute. He stated that, because of the pacemaker, Newman’s heart rate never had the opportunity to slow down. There was no autopsy done, but Dr. Wolf testified as to his belief of what caused Newman’s death:
My opinion is that there was no acute exacerbation of his spinal cord injury... I would contend that there was no worsening of his spinal cord injury as a result of the myelogram procedure. However, in the process of turning Mr. Newman in the prone position, I believe that he probably had a decrease in his cardiac index. His heart rate was not able to go up to compensate ... And so as a result of having a lower cardiac index, he was not able to develop the same amount of perfusion of his body organs, and that sort of produced a progressive worsening of his neurogenic shock. And so, you know, it’s tragic that this happened as a result of being turned to the prone position, but I think it’s an inescapable phenomenon because he would have had to be turned into the prone position to have this corrective surgery to stabilize his neck. So essentially it was a time bomb that just so happened to correspond with that procedures.
|i2In Dr. Wolfs opinion, it was probable that had Newman undergone surgery, he likely would have died at the time of the surgery.
The jury was presented with different, viable theories and opinions as to Newman’s condition and treatment. Dr. Juneau, Dr. Voorhies, and Dr. Wolf agreed that the myelogram was necessary. Although Dr. Hudgins testified that he believed the C2 lateral puncture would be a better procedure for Newman, he stated that the decision to do a myelogram was not substandard conduct. Dr. Voorhies and Dr. Wolf also agreed that the standard of care did not require a neurosurgeon to hold the head and neck of Newman during repositioning.
Likewise, the jury was also presented with varying opinions concerning the use of the term “Miami J”. Plaintiffs, however, offered no direct evidence that the senior resident intended for Newman’s C-collar to be removed and he be placed in the actual “Miami J” brand collar, or that the Miami J brand was even necessary. It would seem that if the Miami J brand was so superior to the C-collar worn by Newman, and was so imperative, it would have been placed on him in Lake Charles, before he was transported to Lafayette and thereafter to Shreveport.
The jury returned an 11-1 verdict in favor of LSUHSC, finding that Plaintiffs had not proven by a preponderance of the evidence that LSUHSC had breached the applicable standard of care in the treatment of Newman. After a complete review of this record, we find that it is possible that reasonable minds could disagree regarding the evidence presented, and the jury was not clearly wrong in reaching its verdict. Additionally, we find that the facts are not “so strongly and overwhelmingly in favor of Newman that reasonable men could not arrive at a contrary verdict.” We therefore find the | iatrial court did not err in denying the plaintiffs motion for JNOV, or in the alternative, new trial.
CONCLUSION
Considering the foregoing, the trial court’s judgment, rendered in accordance with the jury’s verdict, is hereby affirmed. We also affirm the trial court’s denial of Plaintiffs motion for JNOV, or in the alternative, a new trial. Costs of this appeal are assessed to appellants.
AFFIRMED.

. Dr, Juneau was subsequently released as a defendant in the suit.

. Pursuant to La. R.S. 9:2794(A), in a medical malpractice case, the plaintiff has the burden of proving:
(1)The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.