942 So.2d 509 (2006)
Yata JACKSON, Individually, Troy Jackson, Individually, and Yata Jackson and Troy Jackson on Behalf of their Minor son, Troy Williams, II
v.
TULANE MEDICAL CENTER HOSPITAL AND CLINIC and its Employees, and Dabney J. Hamner, Jr., M.D. and ABC Insurance Company.
No. 2005-C-1594.
Supreme Court of Louisiana.
October 17, 2006.
Rehearing Denied December 15, 2006.
*510 Weiss & Eason, Gregory C. Weiss, New Orleans, Elaine W. Selle, for Applicant.
Michael R. Guidry, New Orleans, Dwight Doskey, H. Muldrow Etheredge, Covington, for Respondent.
KIMBALL, J.
We granted certiorari to determine whether the court of appeal erred when it declared manifestly erroneous a jury's determination that defendants in a medical malpractice case did not breach the standard of care in their treatment of plaintiff. For the reasons that follow, we find that the evidence supports the jury's findings, and the court of appeal erred when it substituted its view of the evidence for that of the jury. Accordingly, we reverse the judgment of the court of appeal and reinstate the judgment of the trial court.

FACTS AND PROCEDURAL HISTORY
On March 26, 1990, plaintiff, Yata Jackson, was referred by her treating obstetrician, Dr. Max Pailet, to Tulane Medical Center Hospital for evaluation of her preeclampsia. Once she was admitted, Ms. Jackson was evaluated by defendant, Dr. Dabney Hamner, a second-year obstetrics and gynecology resident. Initially, Dr. Hamner performed an ultrasound as part of a physical examination to ascertain the fetus's gestational age, which was revealed to be approximately 37 weeks.
Dr. Hamner discussed his examination and findings with Dr. Pailet, who instructed *511 him to perform an amniocentesis to determine the maturity of the fetus's lungs. Ms. Jackson signed a consent form, which stated that "Dr. Pailet and resident" would perform the amniocentesis and did not mention any risks to the fetus. Dr. Hamner performed the amniocentesis without Dr. Pailet.
On March 30, 1990, Ms. Jackson's son, Troy, was born via cesarean section. Ms. Jackson and Troy were discharged on April 4, 1990. Ms. Jackson testified that once she and Troy got home, she noticed a white dot in his left eye, which her mother had talked about while they were in the hospital. When Ms. Jackson took Troy to the well baby clinic about two weeks after she was discharged from the hospital, she asked the nurse about the white dot in Troy's eye and was told that it was probably just pigment that had not formed yet. Approximately two weeks after that appointment, Ms. Jackson took Troy to the emergency room of Tulane Medical Center Hospital because he had a skin rash. When she also inquired about the white dot in his eye, she was instructed to take Troy to Charity Hospital the next day to have his eye examined.
The next day, Ms. Jackson took Troy to Charity Hospital and was given an appointment to return to the ophthalmology department in a couple of weeks. On May 18, 1990, Troy was seen in the ophthalmology department and found to have a traumatic cataract, a peaked iris, and a corneal scar in his left eye. On May 22, 1990, Troy underwent cataract removal surgery, which revealed a penetrating-type injury to the eye. A second surgery to relieve pressure in the eye was performed on September 25, 1990. After the surgeries, it was determined that Troy has no vision in his left eye.
Subsequently, Ms. Jackson and Troy's father, individually and on behalf of Troy, filed a complaint with the Patient's Compensation Fund alleging that Tulane Medical Center Hospital and its employees were liable to Ms. Jackson, Troy's father, and Troy for damages sustained to Troy's left eye during the amniocentesis. The complaint alleged that defendants' negligence was a direct cause of the injuries and damages suffered by Ms. Jackson, Troy's father, and Troy. The Medical Review Panel concluded "there is material issue of fact, not requiring expert opinion, bearing on liability for consideration by the Court. . . . Namely, insufficient information documenting the ultrasound and amniocentesis procedures versus the complaints of [plaintiff]." However, the Panel concluded there was no causal relationship between the amniocentesis and trauma to the baby because "[t]he nursing notes and the lack of statements by [plaintiff] during her hospitalization, as well as [plaintiff's] subsequent statement in the emergency room at Tulane, on April 29, 1990, evidence that there was no abnormality noted in the baby's left eye, until after hospital discharge."
On December 10, 1992, Ms. Jackson and Troy's father filed suit, individually and on behalf of Troy, for damages sustained during the amniocentesis performed prior to Troy's birth. After trial, the jury found that defendants, Dr. Hamner and Tulane Medical Center, did not breach the standard of care in their treatment of plaintiff, Yata Jackson. Consequently, the jury did not consider the questions of causation or damages.[1] The trial court entered judgment *512 in accordance with the jury's verdict, denying and dismissing with prejudice plaintiffs' claims.
On appeal, a five-judge panel of the Fourth Circuit reversed the trial court's judgment. Jackson v. Tulane Med. Ctr. Hosp. & Clinic, 04-0462 (La.App. 4 Cir. 4/20/05), 900 So.2d 1154 (unpub'd opinion). The court of appeal began its analysis by noting the uncontested nature of plaintiffs' expert obstetrician's testimony that the amniocentesis, which plaintiffs alleged caused blindness in their son's left eye, was not warranted under the circumstances. The court of appeal also noted that this expert testified the performance of the amniocentesis itself fell below the standard of care. After additionally reviewing the nurses' notes of the procedure, Ms. Jackson's testimony, and Dr. Hamner's testimony, the court of appeal concluded the jury clearly erred in finding "no negligence on the part of Dr. Hamner and Tulane Medical Center Hospital and Clinic."
Reviewing the record de novo, the court of appeal examined the testimony and evidence and concluded that the amniocentesis was negligently performed and that the negligently performed amniocentesis caused the baby's eye injury.
The court of appeal went further and found that although plaintiffs failed to plead the issue of informed consent, the issue was actually tried during trial without objection by the defense. Thus, the court concluded, the trial court committed legal error when it denied plaintiffs the right to amend the pleadings to conform to the evidence regarding informed consent during the trial. Considering this issue de novo, the court of appeal concluded that plaintiffs proved that when Ms. Jackson gave her consent for the amniocentesis, she relied on improper and inadequate information regarding the material risks related to the procedure and that if fully informed, Ms. Jackson would not have consented to the procedure.
The court of appeal awarded the following damages to the child: (1) $250,000 for past and future pain and suffering; (2) $250,000 for permanent disability; and (3) $17,770 for past and future medical expenses. The court did not award damages to the child's parents.
We granted certiorari to review the correctness of the court of appeal's judgment. Jackson v. Tulane Med. Ctr. Hosp. & Clinic, 05-1594 (La. 1/13/06), 920 So.2d 217.

DISCUSSION
Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In order to reverse a fact-finder's determination, an appellate court must review the record in its entirety *513 and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Salvant v. State, 05-2126 (La. 7/6/06), 935 So.2d 646; Stobart, 617 So.2d at 882. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217, p. 11 (La.4/3/02), 816 So.2d 270, 279. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844. However, where documents or objective evidence so contradict the witness's testimony, or the testimony is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the testimony, the court of appeal may find manifest error or clear wrongness even where the finding is purportedly based on a credibility determination. Id. at 844-45. But where this situation does not exist, and a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. at 845.
In a medical malpractice case, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 9:2794(A); Salvant, 05-2126 at p. 6, 935 So.2d at 651; Pfiffner v. Correa, 94-0924, pp. 7-8 (La. 10/17/94), 643 So.2d 1228, 1233.
In the instant case, the jury specifically found that neither Dr. Hamner nor the employees and/or staff of Tulane Medical Center Hospital breached the standards of care in their treatment of Ms. Jackson. A complete reading of the closing arguments presented by counsel gives us insight into the factual findings made by the jury when they answered the first two questions on the jury verdict form "no." When read in context, the closing arguments make it clear that the jury did not believe Troy's eye injury occurred during the amniocentesis procedure.
When explaining to the jury how to answer the jury verdict form, plaintiffs' attorney stated:
You are going to be asked, first of all, "Do you find by preponderance of the evidence that the defendant, Dr. Dabney J. Hamner, M.D., breached the standard of care in his treatment of Yata Jackson?" Yes or no.
Was it below the standard of care? He stuck the needle into the baby's eye. He shouldn't have stuck the needle into the baby's eye. That's a breach.

*514 Is that as bad as the breach that Tulane had? Probably not. Tulane let this inexperienced resident do it.
Next, Number 2, "Do you find by a preponderance of the evidence that any of the employees and/or staff of defendant, Tulane Medical Center Hospital and Clinic, breached the standard of care in their treatment of Yata Jackson?"
Yes. They let an inexperienced doctor do this unsupervised. They did not train him in the safest way of doing it. They didn't train him how to do it suprapubically. Even to this day, he doesn't know how to do a real time ultrasound amniocentesis by himself.
If your answer to Question 1 or 2 is yes, then you go forward to the next or third question. If you answer both of these no, that's it. Plaintiff loses. And we have said that more likely than not Yata Jackson or Dina Jackson, or someone else you never heard of, didn't stick the stick the needle in the baby's eye.
Similarly, the defense attorney explained:
Did you find by preponderance of the evidence that the defendant Dr. Dabney Hamner, M.D., breached the standard of care in treating Yata Jackson?
Ladies and gentlemen, I saw no evidence whatsoever that he breached the standard of care of Yata Jackson.
And the reason they are assuming this accident had to have happened in the hospital, when there is no evidence whatsoever that it, in fact, did happen in the hospital, but there is a period of time that Troy Jackson was out of that hospital, from April 4th to April 29th, when the earliest time that we find out about that dot is on April 29. And Miss Jackson told us that her mother and her noticed it a week after they got home.
Do you find by a preponderance of the evidence that any of the employees and staff of Tulane Medical Center and Hospital breached the standard of care in their treatment of Yata Jackson? Well, I think the answer to that question is absolutely not. I don't see it.
These arguments to the jury make it plain that the jury did not believe it was during the amniocentesis that Troy's eye was injured.
After considering the record as a whole, we find a reasonable factual basis to support the jury's determination that defendants did not breach the standard of care in their treatment of Ms. Jackson because Troy's eye injury did not occur during the amniocentesis procedure. Thus, we find no manifest error in the jury's determination.
Dr. Hamner testified that after he performed the initial physical examination and history, he discussed Ms. Jackson's situation with Dr. Pailet, who decided to do an amniocentesis to determine the maturity of the fetus. The amniocentesis was necessary because Dr. Pailet had only seen Ms. Jackson three or four times, so there was a possibility she was not actually 37 weeks along. Dr. Hamner testified that the ultrasound showed the amniotic fluid was not around the fetus's head, and that even if it was, he would never insert the needle in a pocket of fluid near the fetus's head. He stated that when he performed the amniocentesis, the fluid drawn was clear. Had any injury occurred, the fluid would have contained blood. Dr. Hamner also related that the results of the tests on the amniotic fluid were normal and did not indicate that any other tissues or contents were present in the fluid.
Although Ms. Jackson and Dina Jackson, Ms. Jackson's mother and Troy's grandmother, testified that Dina Jackson saw a white dot in Troy's eye before he *515 was discharged from the hospital after his birth, Ms. Jackson stated in her deposition that her mother had noticed the white dot in the first week he was at home. Additionally, the Tulane medical records indicate that when Ms. Jackson took Troy to the emergency room 25 days after his discharge from the hospital, she reported the white dot had been in his eye for about two weeks.
Defendants' expert in the fields of obstetrics, gynecology, and reading ultrasounds, Dr. Lazarus, testified that it would have been impossible for Dr. Hamner to injure Troy's left eye during the amniocentesis as follows:
Q: Do you have any opinion, based upon . . . a reasonable degree of medical probability, based on your 30-plus years of experience as a Board-certified obstetrician and gynecologist, as to whether or not there is any truth to that allegation [that Dr. Hamner injured Troy's eye with the amniocentesis needle], sir?
A: I think that this is virtually impossible, given the evidence that I'm aware of, that . . . an injury to the left eye could have been sustained at the time of the amniocentesis.
And the reason I say that is that, first of all, during the procedure of an amniocentesis, knowing that the head is down here, you wouldn't put the needle down here toward the head. You would come up here to the small part where the fluid is. Unfortunately, we don't have pictures of that, but clearly, that's where it would be.
But, most importantly, is that since this is the right side of the head and this is the left side of the head and, so, again, the right side of the head is up. The left side is down. It would be impossible to hit the left eye. It would be away from the needle. It's on the opposite side of the head. It wouldn't be possible to get the needle in the left eye.
Dr. William Gill, a pediatrician with a subspecialty in neonatology, performed a physical examination of Troy following his delivery. Dr. Gill testified that he examined Troy's eyes by both a visual examination with his own naked eyes and with an ophthalmoscope and did not see anything that resembled a white dot in Troy's eye. Dr. Gill acknowledged, however, that if the scar was not in the center of Troy's eye and if the eye was asymptomatic, he could have missed seeing it during the examination.
Considering the above testimony, we conclude the jury could have reasonably determined that defendants did not breach the standard of care in their treatment of Ms. Jackson or that Troy's eye was not injured during the amniocentesis. The court of appeal's conclusion that "the jury was clearly wrong to find no negligence on the part of Dr. Hamner and Tulane Medical Center Hospital and Clinic" is erroneous and suggests that the court of appeal improperly substituted its factual findings for those of the jury. While the evidence detailed by the court of appeal could support a jury determination that Dr. Hamner and Tulane Medical Center were negligent, the jury heard that evidence, made credibility determinations, and decided to the contrary. We find no clear error in its determination.
The court of appeal also determined that the trial court erred when it refused to allow plaintiffs to expand their pleadings to include lack of informed consent as a cause of action. While the consent form omitted any reference to the risks faced by the fetus during amniocentesis, we find this issue, even if resolved in favor of plaintiffs, would be irrelevant in light of our determination that the jury was not manifestly erroneous in finding defendants *516 were not negligent in their treatment of Ms. Jackson.

DECREE
For the reasons explained above, we find the court of appeal erred in its determination that the jury was clearly wrong to find no negligence on the part of Dr. Hamner and Tulane Medical Center. In light of the evidence presented in this case, the jury could have reasonably concluded that defendants did not breach the standard of care in their treatment of Ms. Jackson or that Troy's eye was not injured during the amniocentesis. Consequently, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated.
REVERSED.
CALOGERO, C.J., dissents for reasons assigned by WEIMER, J.
JOHNSON and WEIMER, JJ., dissent and assign reasons.
JOHNSON, Justice, dissenting.
I agree with the court of appeal that the trial jury was clearly wrong in failing to find negligence on the part of Dr. Dabney Hamner and Tulane Medical Center Hospital and Clinic. Plaintiffs' son, Troy, suffered a serious eye injury caused by a needle penetration that resulted in complete blindness in his left eye. Dr. David Newsome, the only ophthalmologist who rendered an opinion, stated that the cause of injury was a needle penetration that occurred during amniocentesis.
Any other conclusion is clearly wrong and contrary to the evidence. For this reason, I would affirm the decision of the court of appeal.
WEIMER, J., dissenting.
I respectfully dissent from the majority's reinstatement of the judgment rendered pursuant to the jury verdict in favor of the defendants. I agree with the result reached by the court of appeal.
The majority of this court concludes the jury could have reasonably determined that defendants did not breach the standard of care in their treatment of Ms. Jackson or that Troy's eye was not injured during the amniocentesis.[1] Labeling as erroneous the court of appeal's conclusion that the jury was clearly wrong to find no negligence on the part of Dr. Hamner and Tulane Medical Center Hospital and Clinic, the majority of this court finds the court of appeal substituted its factual findings for those of the jury. Thus, the majority finds no clear error in the jury's determination. I disagree.
In my opinion it was legal error for the trial court to keep the issue of informed consent from the jury. Thus, the jury verdict was tainted, which triggers the well established rule that appellate review of the jury verdict for manifest error is not warranted. In another medical malpractice case, which has been often cited, this court instructed:
[T]he court of appeal examined the record in this case with a view toward deciding whether the result reached by the jury was or was not "clearly wrong." When a jury is given incorrect instructions in the law, or when a trial court makes a consequential error in the exclusion of evidence, no weight should be *517 accorded the judgment of the trial court which implements the jury verdict. The jury verdict in this case was "tainted" by the trial court's consequential error in excluding the testimony of Dr. Lovelace. In such situations the jury verdict is simply not entitled to a presumption of regularity.
What an appellate court must do at this juncture is make an independent review of the record before it and decide which party should prevail by a preponderance of the evidence. Due consideration and appropriate weight should be given to all of the evidence. . . .
A court of appeal should not (as was done here) decide whether a tainted jury verdict was "manifestly erroneous" or not "clearly wrong." The manifestly erroneous or clearly wrong standard of appellate review is the standard by which the facts found by the trial court are measured. It assumes that consequential evidentiary rulings and instructions on the law were correct and proper. Thus, the clearly wrong or manifestly erroneous standard of review applies only to jury verdicts which follow properly conducted trials. The standard should not be applied when the jury verdict is tainted by error. . . . [On remand, the] court of appeal shall make an independent determination of whether or not the plaintiff's evidence preponderates, without affording any deference to the jury verdict. [Citations and footnotes omitted.]
McLean v. Hunter, 495 So.2d 1298, 1304 (La. 1986). See also, Bullard v. State, Department of Transportation and Development, 98-1942, p. 3 (La.App. 1 Cir. 11/5/99), 744 So.2d 212, 215, writ denied, 99-3468 (La. 2/11/00), 754 So.2d 939.
Although the court of appeal majority did not follow McLean and, instead, considered manifest error prior to addressing the issue of informed consent, I, nevertheless, agree with the majority's analysis of the informed consent issue. The court of appeal majority found that the trial court abused its discretion in denying the plaintiffs' motion to enlarge the pleadings to conform to the evidence and include the claim of lack of informed consent. The majority noted that plaintiffs introduced the consent form, questioned Dr. Hamner about the form, questioned plaintiffs' expert about the form, questioned Ms. Jackson about the form, and that defense counsel not only did not object, but also examined the witnesses about the form. The rationale was that LSA-C.C.P. art. 1154[2] permits enlargement of the pleadings when issues not raised by the pleadings are tried by express or implied consent of the parties. The opinion cites as support Roberson v. Provident House, 576 So.2d 992 (La. 1991), in which this court found that the introduction at trial of the plaintiff's deposition containing testimony establishing a medical battery was sufficient *518 to raise that claim even though not previously pled. "So long as the facts constituting the claim or defense are alleged or proved, the party may be granted any relief to which he is entitled under the fact-pleadings and evidence." Roberson, 576 So.2d at 994, quoting Cox v. W.M. Heroman & Co., Inc., 298 So.2d 848, 855 (La. 1974).
In the instant case, the court of appeal majority found the trial court committed legal error in denying plaintiffs' motion to amend the pleadings, and went on to conclude that the form insufficiently informed Ms. Jackson of the known risks to herself and her fetus.
Thus, the court of appeal correctly reviewed the record de novo and, in my view, correctly determined the plaintiffs carried their burden of proving by a preponderance of the evidence that the standard of care was breached. Because the court of appeal's opinion was unpublished, I quote from the section of the opinion that addresses this issue:
In the present case two obstetricians were qualified as expert witnesses, Dr. Frank Battaglia for the plaintiffs and Dr. Edward Lazarus for the defendants. Dr. Battaglia testified that he had performed hundreds of amniocentesis procedures. He further testified that the care rendered by Dr. Hamner and the Tulane staff, was below the standard of care for an obstetrician for several reasons. The first reason was because the "amniocentesis was not warranted under the circumstances." He stated that, "if you weigh the risk of the amniocentesis and the benefits of what could have been obtained, there was no reason to do it at that time." Ms. Jackson was in her thirty-seventh week of pregnancy and full term was thirty-eight weeks. Dr. Battaglia explained that the reasonably prudent thing to do would have been to proceed with the delivery. Dr. Lazarus did not render an opinion as to whether the amniocentesis was warranted. Thus, the only expert medical testimony regarding the necessity of the procedure was uncontested.

Dr. Battaglia not only found that the decision to perform the amniocentesis fell below the standard of care; he also determined the amniocentesis was performed in a sub-standard manner. There were three accounts of the amniocentesis procedure presented: 1) what was contained in the physician progress notes recorded by Dr. Hamner; 2) what was stated in the nurses['] notes; and 3) the testimony of Ms. Jackson, the only person who claimed to have any independent recollection of the procedure.
Dr. Hamner testified that even though he had no independent recollection of the procedure he was confident he performed it in the same manner he always performs amniocentesis, taking an ultra sound just prior to inserting the needle to withdraw fluid. However, his documentation failed to indicate whether the ultrasound was performed prior to and during the procedure, and if so, what it showed. The documents also failed to note where any pockets of fluid were located, how many times Dr. Hamner inserted the needle or the position of the fetus. Even the Medical Review Panel and Dr. Lazarus' testimony at trial established that Dr. Hamner's notes on the procedure were inadequate, therefore Dr. Lazarus could not give an opinion regarding whether the procedure was performed in accordance with the standard of care. The plaintiffs' expert's opinion that Dr. [Hamner's] performance of the procedure fell below the standard of care was undisputed by the defendants' expert.

*519 The nurses' notes provided additional information about the procedure. Those documents gave times relating to the ultrasound and the actual insertion of the needle. The purpose for the ultrasound is to identity the position of the fetus and locate the pocket of amniotic fluid. Dr. Battaglia stated that by waiting too long, especially with a fetus so developed, there can be a change in position. The nurses' notes specify that an ultrasound was conducted at 15:15, and the first attempt at the amniocentesis failed at 15:35. There was no indication that a second ultrasound was performed prior to the second needle attempt at 15:45, a delay of thirty-minutes. Dr. Battaglia claimed that based on the times provided in the nurses' notes, there was too much time between the ultrasound and the insertion of the needle. In Dr. Battaglia's opinion that was a breach of the standard of care by Dr. Hamner.

According to Ms. Jackson's recollection of the procedure, Dr. Hamner inserted the needle, moved it around and pulled it out halfway. Then he pushed the needle back in and moved it around again. Finally, he removed the needle completely and reinserted it moving it around some more. After Dr. Battaglia's review of Ms. Jackson's account of the events surrounding the procedure, he stated once again that he was of the opinion that Dr. Hamner's care and performance of the procedure was substandard.

There was nothing in the record to dispute Dr. Hamner's negligence, other than his own testimony. Although, Dr. Hamner testified that he had no independent recollection of the amniocentesis performed on Ms. Jackson, he claimed to be sure that he performed the procedure in a proper manner.
Dr. Battaglia also opined that Tulane's staff, particularly, Dr. Sumner, was negligent in approving the amniocentesis and secondly, by failing to supervise the procedure. Again, Dr. Hamner was a resident at the time . . . he performed the amniocentesis. [Emphasis supplied.]
Addressing the issue of causation, the court of appeal majority went on to note that plaintiffs carried their burden of proving a causal relationship between the negligently performed amniocentesis and Troy's injury. Based on the record, the only ophthalmologist who rendered an opinion as to the cause of Troy's eye injury was Dr. David Newsome, one of Troy's subsequent treating physicians. It was Dr. Newsome's opinion that the injury to Troy's left eye was "caused by a needle penetration that occurred during the amniocentesis."
Significantly, Dr. Newsome testified he examined the baby on two occasions and was subsequently provided with the baby's and mother's medical records. He stated that the scar on Troy's eye was smooth and circular and caused by something that would approximate a 20-gauge hypodermic needle. Dr. Newsome made that determination prior to finding out that a 20-gauge hypodermic needle was used for the amniocentesis.
The court of appeal majority found that Dr. Newsome's findings, together with Ms. Jackson's testimony regarding the performance of the amniocentesis procedure, and the baby's grandmother's testimony that she noticed something wrong with his eye before he was released from the hospital, "certainly make the assertion that Troy's eye was injured during the procedure more probable than not." The court of appeal noted that although the defense suggested the eye injury happened during the two weeks after Troy was released *520 from the hospital, there was no evidence presented to support that theory.
Thus, I agree with the court of appeal's conclusion that the record supports a finding of causation between the negligently performed amniocentesis and Troy's eye injury. I would affirm the decision of the court of appeal.
NOTES
[1] Specifically, the jury answered the following:

1. Do you find, by a preponderance of the evidence, that the defendant, Dr. Dabney J. Hamner, Jr., M.D., breached the standard of care in his treatment of Yata Jackson?
 Yes _________
 No X 
2. Do you find, by a preponderance of the evidence, that any of the employees and/or staff of defendant, Tulane Medical Center Hospital and Clinic, breached the standards of care in their treatment of Yata Jackson?
 Yes _______
 No X 
The Jury Verdict Form instructed that if the answer to questions 1 and 2 was "No," the jury should not answer further questions, but the foreperson should sign and date the form and return it to the court.
[1] Because the jury answered only two interrogatories, both of which dealt with the standard of care and not with causation, the jury made no factual finding regarding when or how Troy's eye was injured. Venturing into speculation as to the jury's consideration of causation, especially on the basis of argument of counsel which is not evidence, is problematic.
[2] LSA-C.C.P. art. 1154 provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence.