WILLIAMS, J.
pin this medical malpractice action, the trial court rendered a judgment, in accordance with the jury’s verdict, in favor of defendant, Dr. Ravish V. Patwardhan. The court also denied a motion for a judgment notwithstanding the verdict (“JNOV”), or in the alternative, a new trial, filed by plaintiff, Robin Fanguy. For the following reasons, we affirm.
FACTS
On May 22, 2007, Robin Fanguy, presented to defendant, Dr. Ravish V. Pat-wardhan, a neurosurgeon, for treatment. Ms. Fanguy, who had been referred to Dr. Patwardhan by her primary physician, Dr. Carl Hines, complained of low back pain, numbness, pain and tingling in her left leg and pain in her left hip.[1] A subsequent MRI revealed a dessication of the disc at L5-S1; a discogram revealed concordant back pain at L4-5 and L5-S1. As a result of the radiological findings, Dr. Patwar-dhan recommended that Ms. Fanguy undergo a two-level transforaminal lumbar interbody fusion (“TLIF”) at L4-5 and L5-S1.
Dr. Patwardhan performed the TLIF on July 9, 2007. According to Dr. Patwar-dhan’s testimony, throughout the surgery, he monitored Ms. Fanguy’s electromyo-graphic (“EMG”) status and he performed the surgery with the use of a fluoroscope. In his postoperative dictation, Dr. Patwar-dhan stated that the rods, screws and cages were properly placed. Dr. Patwar-dhan also testified that he verified the placement of the hardware via fluoroscopy during the surgery; however, he did not print any fluoroscopic images and 12did not obtain postoperative radiographic studies.
On July 24, 2007, Ms. Fanguy returned to Dr. Patwardhan’s office for her first postoperative examination. She reported that she continued to experience back pain. Again, Dr. Patwardhan did not obtain any radiographic studies. Instead, he assured Ms. Fanguy that postoperative pain and inflammation were common and instructed her to continue to take her medication.
Thereafter, on August 28, 2007, Ms. Fanguy called Dr. Patwardhan’s office and reported pain in her left hip. Dr. Patwardhan referred her to Dr. Cambize Shahrdar, an orthopaedic surgeon, who evaluated her on September 21, 2007, and February 5, 2008.[2] Dr. Patwardhan did not schedule any appointments with Ms. Fanguy between August 2007 and February 2008. He testified that he instructed her “to call me if there was a problem. She never called me saying there was a new problem[.]”
On February 12, 2008, Ms. Fanguy returned to Dr. Patwardhan’s office, complaining of low back pain radiating into her left leg, numbness and tingling in her left *1001 leg and “constant pain in [her left] leg [and left] foot.” Dr. Patwardhan ordered x-rays, which revealed that one of the cages he had inserted during the TLIF was displaced. He opted to treat Ms. Fanguy conservatively and referred her to a pain management specialist.
On March 20, 2008, Ms. Fanguy was evaluated by Dr. Rebecca Posner, a pain specialist. During this visit, Ms. Fanguy reported numbness, tingling and weakness in her left leg. Thereafter, she was referred to Dr. |sMilan Mody, an orthopaedic spine specialist.
Dr. Mody evaluated Ms. Fanguy on April 16, 2008. According to the records from that visit, Ms. Fanguy reported that she had fallen from a ladder at home. Dr. Mody ordered x-rays which revealed that the spacers that had been inserted by Dr. Patwardhan were protruding posteriorly into Ms. Fanguy’s spinal canal. Initially, Dr. Mody opted to treat Ms. Fanguy conservatively; he ordered a nerve conduction study and CT myleogram and instructed Ms. Fanguy to perform home exercises. On June 12, 2008, Ms. Fanguy returned to Dr. Mody with continued complaints of back pain. Dr. Mody recommended a revision of the TLIF.
On June 24, 2008, Ms. Fanguy obtained a second opinion from Dr. Euby Kerr, an orthopaedic spine surgeon. Dr. Kerr reviewed the x-rays and opined that the cage Dr. Patwardhan had inserted at L4-5 was compressing Ms. Fanguy’s L5 nerve root. After unsuccessfully treating Ms. Fanguy conservatively, Dr. Kerr performed a revi-
sion of the TLIF on September 8, 2008. Thereafter, Ms. Fanguy reported to Dr. Kerr that her condition had improved and she only experienced minor complaints of numbness and tingling in her left leg and foot.[3]
On October 30, 2008, Ms. Fanguy filed a complaint against Dr. Patwardhan with the Patient’s Compensation Fund, and a medical review panel was convened. The panel concluded that Dr. Patwardhan failed to meet the applicable standard of care in providing postoperative care to Ms. Fan-guy and that the failure “was a factor in reducing the patient’s chance for |4a better outcome.”[4] The panel stated:
Dr. Patwardhan made a contemporaneous statement at the time of [the] procedure that the rods, screws and cages were properly placed. There is no objective evidence to establish that they were not properly placed. Displacement of the cages is a known risk following this procedure, although the risk is relatively low.
[[Image here]]
The standard of care required that x-rays should have been done immediately following the procedure and at the time of her follow-up visit, but certainly sooner than February 12, 2008, for this patient. The follow-up care and failure to obtain these x-rays was a breach of the applicable standard of care.
The delay in follow-up treatment and addressing the displaced cage was a factor in reducing the patient’s chance for a better outcome.
*1002 On June 22, 2011, Ms. Fanguy filed this lawsuit against Dr. Patwardhan, alleging that his conduct caused her to sustain “extensive nerve damage — causing partial (yet permanent) paralyzation, and intense permanent pain[J” She also alleged that her condition was “gravely aggravated” by Dr. Patwardhan’s “failure to perform the necessary and expected follow-up treatment dictated by the applicable postoperative standard of care[.]”
A jury trial was held on January 28-February 1, 2013, during which Ms. Fanguy, Dr. Patwardhan and numerous medical experts testified. Ms. Fanguy’s voluminous medical records were also introduced into evidence.
Ms. Fanguy testified at trial as follows: she began experiencing “back ^problems” in 2001, and they gradually worsened; Dr. Hines began treating her for back pain in 2006; initial treatment was unsuccessful; eventually, Dr. Hines referred her to Dr. Patwardhan, who obtained multiple diagnostic tests before informing her that surgery was her “only option”; after surgery, the pain in her back was “worse than before”; she told Dr. Patwardhan about her pain, and he advised her that the pain was caused by inflammation and would improve “over time”; on her first postoperative follow-up visit, she informed Dr. Patwardhan she was “still in intense pain”; Dr. Patwardhan told her the pain was related to the surgery and would improve; between September 2007 and February 2008, she made multiple telephone calls to Dr. Patwardhan’s office with complaints of pain; Dr. Patwardhan’s nurse attributed her pain to inflammation and instructed her to continue taking her pain medications; she asked Dr. Patwardhan to order x-rays; he instructed her to remain on bed rest, take her medication and follow up with her pain management doctor; at the February 2008 visit to Dr. Patwar-dhan’s office, she “demanded” that he obtain x-rays; she did not return to his office but she was told over the telephone that the x-rays were “normal”; she continued seeing Dr. Hines and her pain management doctor; Dr. Hines referred her to Dr. Mody, who ordered an EMG, x-rays and a MRI; Dr. Mody informed her that two of the “discs” were not located properly and that she would need another surgery; her back felt better as soon as she awakened after the second surgery.
On cross-examination, Ms. Fanguy admitted that she had significant leg and back pain before she went to Dr. Patwar-dhan; however, she denied having trouble walking. She also denied ever requesting or receiving a | (¡motorized wheelchair. However, she was confronted with her medical records which indicated that Dr. Hines ordered a motorized wheelchair for her in 2006. While examining Ms. Fanguy for the wheelchair, Dr. Hines noted that her left lower extremity was “moderately weakened.” Dr. Hines also noted that Ms. Fanguy “experiences falls”; “ambulation causes excessive pain” and that she had an “unsteady gait.” When noting the duration of Ms. Fanguy’s need for the power wheelchair, Dr. Hines responded, “Lifetime.” Additionally, Dr. Hines’ notes revealed that on November 16, 2006, Ms. Fanguy called his office, and reported that her “legs hurt and feel prickly. When I walk, I walk with a limp.”
Ms. Fanguy was also confronted with her medical records from visits to various hospitals and physicians prior to her initial visit to Dr. Patwardhan. The records revealed that on January 29, 2007, she presented to the emergency room at Minden Medical Center, complaining that she had fallen and was unable “to move bilateral lower extremities.” Subsequently, on May 1, 2007, Ms. Fanguy returned to Minden Medical Center’s emergency room com *1003 plaining of “lower extremity numbness and tingling with activities.” These notes reflected that Ms. Fanguy was “currently using a walking stick for help.” Moreover, Ms. Fangujfs medical records reveal that in April 2008, after the surgery performed by Dr. Patwardhan, but before the revision surgery performed by Dr. Kerr, Ms. Fan-guy went to Dr. Hines and stated, “My low back hurts. I fell off a ladder on Saturday.” However, during her testimony, Ms. Fanguy vehemently denied ever falling from a ladder.
Dr. Patwardhan testified that Dr. Hines referred Ms. Fanguy to him 17because she had experienced severe back pain for a number of years. She also had weakness in her legs, which required the use of a motorized wheelchair. According to Dr. Patwardhan, he informed Ms. Fanguy that the TLIF would help her back pain but “there was not a high chance that it will help your leg symptoms[.]” Dr. Patwar-dhan further testified that during the procedure, he used fluoroscopy to verify the placement of the cages; however, he was unable to obtain images using the equipment in use at that time. He stated, “I saw the x-ray; I made sure the hardware was appropriately placed.” Dr. Patwar-dhan admitted that he did not order postoperative x-rays because Ms. Fanguy was “complaining of the same leg symptoms she had complained about prior to the surgery.” Dr. Patwardhan explained that Ms. Fanguy’s complaints were not similar to the symptoms of a patient who had experienced the dislocation of a cage; therefore, he did not believe x-rays were necessary. Further, Dr. Patwardhan testified that the x-rays he ordered in February 2008 showed that the cages “were slightly displaced”; however, he did not see any obvious compression of the nerve roots. Thus, he believed that Ms. Fanguy was experiencing “continuing symptoma-tology” that she experienced prior to the surgery. He testified that after he obtained the x-rays, he referred Ms. Fanguy back to Dr. Jimmy Ponder, her pain specialist, and she never returned to see him.
Dr. Euby Kerr testified that he treated Ms. Fanguy from June 2008, before deciding to revise the TLIF on September 8, 2008. He testified that during the surgery, he observed that the pedicle screws were properly placed; however, the cage at L5-S1 “was completely displaced.” Dr. Kerr testified that the cage had transected (severed) approximately 15-20% of the |snerve and the cage at L4-5 was “pulling at the L5 nerve root.” According to Dr. Kerr, if Ms. Fanguy complained of pain shortly after the first surgery, obtaining x-rays sooner could have led to discovering the displacement of the hardware. He testified that it is standard procedure to order postoperative x-rays within three to four weeks to “make sure the hardware is intact, make sure there isn’t any gross catastrophic failures, things of that nature.” He further testified that, in this case, x-rays should have been obtained sooner “in particular because the patient had still continued complaints of pain” and Dr. Patwardhan had an obligation to investigate the source of the pain.
When questioned on direct examination, Dr. Kerr testified that the transection of Ms. Fanguy’s nerve root could have occurred when Dr. Patwardhan inserted the cage or it could have occurred over time. Dr. Kerr further testified that the prolonged compression of the nerve caused Ms. Fanguy to have constant, severe leg pain. He stated that the revision surgery eliminated Ms. Fanguy’s pain “to a fair degree” and that her motor strength and mobility improved, but did not completely resolve. By his last visit with her, on November 6, 2008, she was walking with a limp and complaining of “pain that radiates into the right posterior and lateral lower *1004 extremity, with increasing numbness and tingling into the left lower extremity going down into her foot.”
On cross-examination, Dr. Kerr testified that when he examined Ms. Fanguy on September 24, 2008, her bilateral motor strength in the lower extremities was normal. He also testified that Ms. Fanguy reported that her back pain was “much better than before surgery” and that her leg pain had | improved.
Dr. Brian Willis, a neurosurgeon, testified that he was not involved with Ms. Fanguy’s care; however, he was a member of the medical review panel that considered this case. Dr. Willis opined that Ms. Fanguy was not a candidate for a TLIF because her MRI did not reveal any rupture, herniation of discs or instability of the spine. Dr. Willis testified that the evidence did not prove that Dr. Patwar-dhan did not place the cages properly; however, obtaining x-rays, either in the operating room or within a day or two after the surgery “would have documented that the cages were in good position.” Dr. Willis opined that the appropriate standard of care was to check the placement of the cages by obtaining x-rays during the postoperative period. Additionally, he stated that if Dr. Patwardhan had investigated Ms. Fanguy’s complaints further, it “may have revealed, maybe, that there was a displacement or malpositioning of the grafts and that a revision surgery at that time may potentially have resulted in an improved outcome.”
On cross-examination, Dr. Willis reiterated that the evidence did not establish that Dr. Patwardhan improperly placed the cages and there was no way to determine when the cage became displaced. Dr. Willis stated that he did not know if the delay in ordering x-rays caused Ms. Fanguy permanent harm. He testified that obtaining the x-rays sooner might have improved her chance of having a better outcome; however, he was unable to testify to that with certainty.
Dr. Benjamin Nguyen, a neurologist who evaluated Ms. Fanguy, also testified. He stated that Dr. Mody referred Ms. Fanguy to him for an EMG/nerve conduction study in April 2008. In his note dated April 24, Iiq2008, Dr. Nguyen noted that Ms. Fanguy “walks very gingerly and tends to drag her left leg.” However, he also noted that Ms. Fanguy was able to move both legs freely “when she is distracted.” Dr. Nguyen testified that the EMG/nerve conduction study was normal and Ms. Fanguy did not have any denervation in her left leg. He opined that Ms. Fanguy’s weakness in her left leg was “most likely due to conversion disorder.”[5] He testified that he believed Ms. Fanguy’s symptoms of left leg weakness were “fictitious.” He explained that Ms. Fanguy reported that she was unable to walk; however, his observations and examination revealed that Ms. Fanguy did not have difficulty walking. Dr. Nguyen also opined that Ms. Fanguy did not have any nerve injury to L4-5 and L5-S1 that would cause her to experience foot drop or any other problems with her left leg or foot.[6]
■ Dr. Robert Lieberson, a neurosurgeon, also testified. He opined that Dr. Patwar- *1005 dhan’s decision to perform the TLIF did not violate the standard of care because Ms. Fanguy had unresolved back pain for more than two years. Dr. Lieberson also opined that Dr. Patwardhan’s postoperative care did not violate the standard of care because it was “pretty much what we do.”
Dr. Marco Ramos, a neurosurgeon and a member of the medical review panel in this matter, also testified. He also opined that Dr. Patwardhan did not breach the standard of care in electing to perform the InTLIF. Dr. Ramos further opined that Dr. Patwardhan did not breach the standard of care in the way he performed the surgery. He explained that the surgery was performed with continuous EMG studies and Dr. Patwardhan placed the cages using a fluoroseope. Dr. Ramos testified that it was apparent to him that Dr. Pat-wardhan performed the surgery correctly with the use of imaging because the screws were placed properly and it is “impossible to do that” without using fluoroscopy. However, he opined that Dr. Patwardhan should have obtained x-rays sooner. According to Dr. Ramos, x-rays might have revealed that the cage was displaced and Ms. Fanguy could have been treated accordingly. Although he testified that Dr. Patwardhan should have ordered x-rays immediately after the surgery, he admitted that he and many other surgeons do not order immediate postoperative x-rays after performing a TLIF. When asked what harm Ms. Fanguy experienced as a result of Dr. Patwardhan’s failure to obtain the x-rays sooner, Dr. Ramos responded:
There is no evidence that this patient had what we usually call [a] fixed neurological deficit. A fixed neurological deficit is a permanent deficit that the patient has as a consequence of neural injury. This patient does not have that.
Dr. Mary McWilliams, another neurologist, also testified. She stated that Ms. Fanguy presented to her on February 4, 2009, complaining of migraine headaches. Dr. McWilliams testified that Ms. Fanguy reported that her left leg was “paralyzed” and that she had foot drop. However, Dr. McWilliams stated that Ms. Fanguy did not give “maximum effort” on tests that involved her motor skills. She documented, “False claim of lower extremity severe weakness [is] proven by inconsistencies in examination.” | ^According to Dr. McWil-liams, generally, spinal nerve damage does not cause weakness and/or sensory loss in only one limb. Her impression was that the origin of Ms. Fanguy’s complaints was emotional, not physical. Dr. McWilliams testified as follows:
In her case, when sitting in the chair and asked to slide her foot back under the chair, she could not move her foot against minimal resistance. I just had my hand behind her ankle. She couldn’t lift her knee and get her foot off the floor. But when she went to get on the exam table, she walked fairly normally across the floor and climbed up one foot and then the other on a step that’s about ... eight inches off the floor. [She] appeared to have minimal difficulty, but certainly was not paralyzed.
[[Image here]]
She had pretend weakness. I don’t know if it was conscious pretend weakness, or if it was psychiatric pretend weakness, but it wasn’t real weakness in the muscles themselves. She could contract with normal strength. She was trying to show me that she couldn’t. She was showing me such severe weakness that it was obvious that it was untrue. But that doesn’t mean that she didn’t have some weakness buried in all of that other stuff. It was true, and I really just couldn’t tell from examining *1006 her, but I could tell that much of what she was complaining of was highly exaggerated.
Portions of the deposition of Dr. Jimmy Ponder, a pain specialist, was read into the record. Dr. Ponder testified that he had been treating Ms. Fanguy for back and leg pain since 2004. Although his office notes reflect that Ms. Fanguy had foot drop, Dr. Ponder admitted that he did not diagnose her with foot drop. He stated that Ms. Fanguy told him that she developed foot drop after the TLIF. Dr. Ponder testified, “I didn’t really diagnose her with that. I kind of assumed maybe that she had some type of tests done in Shreveport.” He also testified that he was not treating Ms. Fan-guy for any new symptoms; he was treating her for the same lumbar radiculopathy that he diagnosed in August 2004. Additionally, Dr. Ponder testified that Ms. 113Fanguy did not require any assistive devices to walk. He further stated that he did not know the cause of Ms. Fanguy’s pain; he just treated her symptoms.
At the conclusion of the trial, the jury found that Ms. Fanguy established, by a preponderance of the evidence, that Dr. Patwardhan “either lacked that degree of knowledge or failed to use reasonable care and diligence, along with his best judgment, in the application of that skill in the treatment of [plaintiff].” However, the jury also found that Ms. Fanguy failed to establish, by a preponderance of the evidence, that Dr. Patwardhan’s breach was a substantial factor in causing harm to her. The trial court signed a judgment in accordance with the jury’s verdict and dismissed Ms. Fanguy’s claims with prejudice.
On February 13, 2013, Ms. Fanguy filed a motion for a JNOV, or in the alternative, a new trial, arguing that the jury’s verdict was “manifestly erroneous, mandating a reversal and obligating [the trial court] to substitute its judgment as to the amount of fair compensation that must be awarded to plaintiff for damages caused by the medical malpractice of the defendantf.]” Following a hearing, the trial judge denied the motion, stating:
⅜ * *
It seems clear to me that the jury took the [Medical Review Panel’s] approach as to what the malpractice was and accepted Dr. Ramos’s analysis. That establishes a deviation below the standard of the care, beneath the standard of care, but whether there are damages from that delay depend entirely on Ms. [Fanguy], and frankly the jury and the Court are of the opinion that she has a less than zero credibility. She is simply not believable, and it is to the point that there may be psychological issues involved in it she is so unbelievable.
Her measure of damages for lack of a timely follow-up 114 depend almost entirely on her testimony as to the damages she suffered. And she is not credible, and the jury apparently just decided that she had not established her damages, because it depends largely on her testimony.
I can see the path the jury took. I don’t think I am allowed to substitute my judgment or what I would have done for what the jury did.
[[Image here]]
[I] can’t say that the jury was manifestly wrong in taking Dr. Ramos’s testimony and in discounting the Plaintiffs testimony. I think that’s within their province.
[[Image here]]
Ms. Fanguy appeals.[7]
*1007 DISCUSSION
As stated above, Ms. Fanguy sought a JNOV, or in the alternative, a new trial. She argued that the jury’s verdict in favor of Dr. Patwardhan on the issue of causation was manifestly erroneous, and therefore, it required the trial court to substitute its judgment for that of the jury and award damages to plaintiff.
Additionally, Ms. Fanguy contends the jury manifestly erred in concluding that she failed to prove a causal relationship between Dr. Patwardhan’s malpractice and the medical expenses and general damages she incurred for the TLIF and postoperative treatment. She argues that the verdict was contrary to the expert testimony presented at trial. According to Ms. Fan-guy, three physicians, Drs. Kerr, Willis and Ramos, opined that Dr. Patwardhan breached the standard of care and, because of that breach, she had to undergo a revision surgery. Dr. Kerr, who performed the revision surgery, testified that the cages were malpositioned. He also testified that 11sone of the cages had partially transected one of the nerve roots leading from Ms. Fanguy’s spine. Additionally, Dr. Kerr testified that the screws and rods were in place; therefore, the hardware did not migrate after the procedure performed by Dr. Patwardhan. As a result, it is clear that the cages were mal-positioned during the TLIF procedure. Dr. Patwardhan did not present any evidence or testimony to refute Dr. Kerr’s testimony.
A JNOV is warranted when the facts and inferences, viewed in the light most favorable to the party opposing the motion, are so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; the motion should be granted only when evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. Peterson v. Gibraltar Sav. and Loan, 98-1601 (La.5/18/99), 733 So.2d 1198; Atkins v. Louisiana Mut. Medical Ins. Co., 47,374 (La.App.2d Cir.11/7/12), 105 So.3d 781, writ denied, 2013-0341 (La.4/1/13), 110 So.3d 585. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men, in the exercise of impartial judgment, might reach different conclusions, the motion should be denied. Anderson v. New Orleans Public Serv., Inc., 583 So.2d 829 (La.1991); Atkins, supra. Simply stated, a trial court can grant a JNOV only when a jury’s verdict is one which reasonable people could not have rendered; if reasonable people could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Atkins, supra; Jackson v. A.L. & W. Moore Trucking, 609 So.2d 1064 (La.App. 2d Cir.1992).
| ifiThe motion for a new trial requires a less stringent test than for a JNOV. A new trial may be granted in any ease if there is good ground therefor. LSA-C.C.P. art. 1974. Whether to grant a new trial requires a discretionary balancing of many factors. Dowles v. Conagra, Inc., 43,074 (La.App.2d Cir.3/26/08), 980 So.2d 180; Gibson v. Bossier City General Hosp., 594 So.2d 1332 (La.App.2d Cir.1991). Unlike the standard applicable to a motion for JNOV, the trial judge may evaluate evidence without favoring any party and draw his own inferences and conclusions. Perhaps the significant authority is the ability to assess the credibility of witnesses when determining whether *1008 to grant or deny the motion for new trial. Dowles, supra. The trial court’s discretion in ruling on a motion for new trial is great, and its decision will not be disturbed on appeal absent an abuse of that discretion. Id.
To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury. LSA-R.S. 9:2794(A); Roberts v. Marx, 47,658 (La.App.2d Cir.1/16/13), 109 So.3d 462, writ denied, 2013-0649 (La.4/26/13), 112 So.3d 847.
The manifest error standard of review applies to our review of medical malpractice claims. Jackson v. Tulane Medical Center Hosp. and Clinic, 2005-1594 (La.10/17/06), 942 So.2d 509; Coody v. Barraza, 47,732 (La.App.2d Cir.3/6/13), 111 So.3d 485. A court of appeal may not set aside a trial court’s or jury’s finding of fact in the absence of manifest error |17or unless clearly wrong. Hays v. Christus Schumpert Northern La. d/b/a Christus Schumpert Health Sys., 46,408 (La.App.2d Cir.9/21/11), 72 So.3d 955; Coody, supra. In order to reverse a fact finder’s determination, an appellate court must review the record in its entirety and conclude that a reasonable factual basis does not exist for the finding and further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Benefield v. Sibley, 43,317 (La.App.2d Cir.7/9/08), 988 So.2d 279, writs denied, 2008-2162, 2008-2210 (La.11/21/08), 996 So.2d 1107, 2008-2247 (La.11/21/08), 996 So.2d 1108; Coody, supra.
Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Hays, supra; Coody, supra. Where there are contradictory expert opinions, the appellate court is bound to give great deference to the conclusions of the trier of fact. Id.
In the instant case, it is undisputed that Dr. Patwardhan did not obtain postoperative x-rays to verify the placement of the cages. The jury concluded that this failure constituted a breach of the applicable standard of care. However, as stated above, when asked, “Did the plaintiffs establish by a preponderance of the evidence that Dr. Patwardhan’s lack of knowledge or failure to exercise the appropriate degree of care and diligence, along with his best judgment in the application of that skill, was a substantial factor in causing harm to Ms. Robin Fanguy?” The jury responded, “No.”
During the four-day trial, the jury was presented with the testimony from multiple witnesses, lay and expert, with regard to whether Dr. Patwardhan breached the applicable standard of care and whether there was |18a causal connection between the breach (the failure to obtain x-rays between July 2007 and February 2008) and the resulting injury (Ms. Fanguy’s continued complaints of pain, weakness and numbness in her left lower extremity).
We have reviewed this record in its entirety and we find that the facts are not “so strongly and overwhelmingly in favor of [Ms. Fanguy] that reasonable men could not arrive at a contrary verdict.” Therefore, the trial court did not err in denying Ms. Fanguy’s motion for a JNOV/new trial.
This record is replete with evidence and testimony supporting the trial court’s judgment. Ms. Fanguy testified that she did not have any weakness in her left leg or problems walking prior to the TLIF performed by Dr. Patwardhan. However, her medical records belie that testimony. *1009 According to Ms. Fanguy’s medical records, in 2006, Dr. Hines ordered her a motorized wheelchair because she was experiencing falls due to an “unsteady gait” and “moderate” weakness in her left leg. Thereafter, she sought treatment from a pain management specialist with complaints of back pain radiating down her legs and pain in her left leg. In January 2007, Ms. Fanguy visited a local emergency room, complaining that she had fallen and was unable to move either of her legs. Approximately one month later, she called Dr. Hines’ office and complained that the “whole left side of [her] body [was] numb.” In June 2007, Dr. Hines documented that Ms. Fanguy’s “ambulation abilities [were] poor without assistance.” Additionally, her medical records show that Ms. Fanguy had been undergoing treatment for fibro-myalgia/chronic pain at least two years before the surgery and her prognosis had been described as “poor.”
[ i9Pr. Kerr testified that there is no way of knowing whether the nerve root compression was caused by Dr. Patwardhan inserting the cages improperly, or whether the cages became displaced over time. Dr. Kerr also testified that although Ms. Fan-guy suffered pain as a result of the compressed nerve, after he revised the TLIF, her pain was “much better than before surgery.”
Similarly, Dr. Willis testified that the evidence did not establish whether the cages were positioned improperly or whether they migrated at a later time. Dr. Willis also acknowledged that EMG/ nerve conduction studies performed after the first TLIF showed that Ms. Fanguy had normal strength and full range of motion in both legs.
Additionally, Dr. Nguyen testified that Ms. Fanguy had normal strength and range of motion in both legs when he evaluated her on April 24, 2008. He further testified that the studies showed that Ms. Fanguy did not have any neurological deficits in her legs. He opined that her complaints of left leg weakness were “fictitious” and were “most likely due to conversion disorder.”
Dr. Ramos testified that Ms. Fanguy’s medical records from various emergency rooms show that she did not have any longstanding effects or weakness in her lower extremities. He also testified that Ms. Fanguy did not have any permanent neurological deficits to indicate that she had experienced a neural injury.
Dr. McWilliams characterized Ms. Fan-guy’s complaints of left leg paralysis/weakness as “false.” She also testified that Ms. Fanguy had “pretend weakness” and that her complaints were “highly exaggerated.”
^Consequently, we cannot say that the trial court erred in rendering a judgment in accordance with the jury’s conclusion that Ms. Fanguy failed to prove that the procedure performed by Dr. Patwardhan caused her left leg pain and weakness. Additionally, in light of the medical records that demonstrate the severity and frequency of Ms. Fanguy’s neurological complaints prior to the surgery, the expert testimony regarding the exaggeration of her symptoms, and the expert opinions that her complaints are psychiatric in nature, as stated above, the trial court did not err in denying Ms. Fanguy’s motion for JNOV or, in the alternative, new trial.
CONCLUSION
For the reasons set forth herein, the trial court’s judgment, rendered in accordance with the jury’s verdict, is hereby affirmed. We also affirm the trial court’s denial of plaintiffs motion for JNOV, or in the alternative, a new trial. Costs of this *1010 appeal are assessed to plaintiff, Robin Fanguy.
AFFIRMED.

. At the time of Ms. Fanguy’s initial visit with defendant, she was 39 years old. She had been treated for back pain by various physicians, including pain management specialists, for a number of years prior to her referral to Dr. Patwardhan.

. Ms. Fanguy reported increasing pain in her hip and Dr. Shahrdar diagnosed her with left hip trochanteric bursitis.

. Ms. Fanguy’s last visit to Dr. Kerr was on November 6, 2008.

. One member of the medical review panel, Dr. Brian Willis, opined that Dr. Patwardhan breached the applicable standard of care by performing the TLIF because Ms. Fanguy was not an appropriate candidate for that procedure. The other members, Dr. Marco Ramos and Dr. Anthony Sin, opined that Dr. Patwar-dhan did not breach the applicable standard of care in performing the procedure based upon Ms. Fanguy’s “unresolved' complaints after two years of conservative treatment, together with the MRI and discogram findings[.]”

. "Conversion disorder,” formally known as hysteria, is considered psychiatric in nature. Patients present with neurological symptoms without any physical impairments.

. Ms. Fanguy underwent another EMG/nerve conduction study on May 7, 2008. The test was performed by Dr. Eric Bicknell, another neurologist, and was normal. According to .Dr. Bicknell’s notes, Ms. Fanguy’s "examination was limited by poor volition motor con-trole.]”

. Dr. Patwardhan has not appealed the portion of the jury’s finding that he breached the *1007 standard of care in his treatment of Ms. Fan-guy-